UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 04-10098-WGY |
| ) | |
| CARMEN FIGUEROA and ) | |
| WILLIAM TEJEDA, ) | |
| ) | |
| Defendants. ) | |

## RENEWED MOTION FOR MISTRIAL

Defendant William Tejeda hereby renews his motion for a mistrial based on juror reactions to the throat-slitting gesture allegedly made by Mr. Tejeda's grandfather in court this past Wednesday, May 4, 2005.  The *voir dire* of the jurors conducted by the Court Monday and Tuesday (May 9-10) of this week, has, if anything, confirmed Mr. Tejeda's belief that the jury has been contaminated and that his right to a fair trial has been irrevocably compromised.  In support of this renewed motion, Mr. Tejeda incorporates herein by reference all the arguments he has previously advanced in writing and orally in support of his original mistrial motion.  In addition, Mr. Tejeda further states:

1.      The alleged throat-slitting gesture occurred on Wednesday, May 4, 2005, the first day of evidence in the case.  It was reported to the Court on May 6, and the Court conducted individual *voir dire* of the jurors concerning the incident on May 9 and 10.  Despite the fact that the *voir dire* was conducted five and six days after the incident had occurred, thirteen of the fourteen sitting jurors instantly knew exactly what the Court was inquiring about.  Even though only two of the sitting jurors had observed the purported throat-slitting gesture, the discussion

the jurors had with one another concerning the gesture obviously made a lasting impression, not just on the observer jurors, but on eleven of the twelve non-observer jurors as well.

2. The safety measures ordered by the Court – namely the removal of Mr. Tejeda's grandparents from the area of the courthouse for the remainder of the trial – were understandable and appropriate under the circumstances. The very fact, however, that the Court felt compelled to take the steps it did, and that the Court has now explained those steps to several jurors, can only serve to heighten the concerns and fears of the jurors. By taking the steps that it has, the Court has directly and indirectly told the jurors that the purported throat-slitting gesture was serious and worthy of fear.

3. The safety precautions the Court has taken cannot as a logical matter eliminate fear that may exist. As the testimony in this case has already made apparent, individuals who are in prison (*e.g.*, Manuel Mendes) can continue to instill fear and trepidation in others. If individuals who are in prison can have that effect on others, so too can individuals who are merely out of sight.

4. In this case, no one reasonably could have feared that Mr. Tejeda's frail, 85 year old grandfather, who has had three strokes and can barely walk or move his hands, would himself cause physical harm to another. To the extent that Mr. Tejeda's grandfather's gesture may have caused fear, it was because of what he could cause others to do. The elimination of the grandfather from the courthouse could not solve this problem.

5. Under the circumstances, the Court had no choice but to *voir dire* all jurors concerning their awareness of the alleged throat-slitting gesture. There can, however, be little question that the very fact of the interviews will heighten juror concerns. The reassurances given

to the jurors by the Court that the problem had been taken care of pale in comparison and emotional resonance to the fact that the Court saw fit to interview each of the jurors.

6.  The Court explained to the jury foreperson (Juror No. 11) that Mr. Tejeda's grandfather's gesture may well have amounted to "contempt of court" and "obstruction of justice." If anything, these characterizations of the gesture will heighten the concerns of the foreperson who was already "really… uncomfortable" about what she characterized as the "very deliberate" gesture made by Mr. Tejeda's grandfather.

7.  In response to the Court's questioning, each of the jurors indicated that he/she could continue to be fair and impartial to the government and to each of the defendants. Independent of the argument that very few people would ever acknowledge in a public courtroom an inability to be fair and impartial, it is apparent from specific answers given by Juror Nos. 11, 30, 14, 22, 1, and 9, that at least as to these six jurors, extra-judicial fears and concerns will affect their deliberations, if not their fairness and impartiality:

- *Juror No. 11* – This juror observed the throat-slitting gesture. At first, she found it "disconcerting," but did not say anything. Two days later, after hearing Sgt. Balcom's testimony concerning the third time he observed the "red van," Juror No. 11 felt "really uncomfortable." She informed all of the other jurors about the gesture and decided that it had been a "very deliberate thing." When asked by the Court whether the matter continued to concern her, Juror No. 11 paused for at least five seconds before responding that she continued to find the gesture disconcerting. Although this juror stated that she believed she could put the gesture out of her head and be fair and impartial to the government and to the two individual defendants, her body language as well as the tone and substance of her other comments belied her stated belief.

- *Juror No. 30* – This juror stated that the gesture "puts pressure on the jury."

- *Juror No. 14* – This juror was left with the impression that the grandfather's throat-slitting gesture had been directed *at* Juror No. 11. As explained by Juror No. 14, although she did not see the gesture herself, her belief, based on the description of the incident that she heard from Juror No. 11, was that the grandfather had looked directly at Juror No. 11 and Juror No. 11 had looked directly back at him and he had then made the throat-slitting gesture. When asked

3

> by the Court what she made of the matter, Juror No. 14 stated that she was concerned with "safety and other things."

- *Juror No. 22* – Based on Juror No. 11's comments, this juror concluded that the throat-slitting gesture had at least looked like a "deliberate motion."

- *Juror No. 1* – This juror stated that the throat-slitting gesture had been "very disconcerting" to the people who saw it. She further stated that it was her assumption that the gesture had been made by a person related to or known by one of the individual defendants.

- *Juror No. 9* – This juror reported that Juror No. 11 had explained that she had seen a person in Court make a gesture "to her" or "at her." According to Juror No. 9, this was the way Juror No. 11 explained it. After hearing Juror No. 11's explanation, Juror No. 9 told her that she "must report it."

These six jurors, at a minimum, should be excused from the jury. Of course, excusing them would leave us without the requisite twelve jurors and would, in and of itself, require a mistrial.

8. A "red van" bearing New York State license plate number GE562E has played and will continue to play a prominent role in this trial. Testimony to date has linked the red van to both Mr. Tejeda *and* his grandfather. Indeed, it was Sgt. Balcom's testimony concerning his observations of Mr. Tejeda's grandfather getting into the red van in front of the courthouse that prompted the foreperson of the jury (Juror No. 11) to discuss her observations of the throat-slitting gesture with all of her co-jurors and then to report the incident to the Court. It was the linking of Mr. Tejeda's grandfather to the red van, and thus to Mr. Tejeda and drug trafficking activity, that transformed the foreperson's discomfort concerning her observations into something much greater. As she put it when questioned by the Court, as soon as she heard Sgt. Balcom's testimony about the third time he saw the red van, it caused her to "now… really feel uncomfortable."

9. Immediately after the foreperson and one other juror (Juror No. 6) were *voir dired* by the Court, the Government exacerbated the prejudice of the extra-judicial throat-slitting gesture by eliciting testimony from Amanda Eldridge about the red van and prominently

displaying a photograph of the red van on a large screen in the courtroom for more than 30 minutes.

10. At the same time that the Government elicited testimony concerning the red van, it also, over defense counsel's objection, elicited testimony from Ms. Eldridge about a "feeling" that she had had one day while driving in the red van with a man she identified as Mr. Tejeda that Mr. Tejeda was going to kill her. The prompt juxtaposition of Ms. Eldridge's testimony about fear of death at the hands of Mr. Tejeda to the Court's *voir dire* of Juror Nos. 11 and 6 likely cemented in the minds of at least those jurors the severely prejudicial link between and among Mr. Tejeda, the red van, and the man in the back of the courtroom. That man, like Mr. Tejeda, had been seen getting into the red van, and that man, again like Mr. Tejeda, had done something that others – rightly or wrongly – took to be threatening. The jurors' asserted protestations about continued impartiality notwithstanding, it is all but inevitable that they will associate (and in some cases have already associated) the extra-judicial throat-slitting gesture with Mr. Tejeda, and that the gesture will weigh in their deliberations.

WHEREFORE, Mr. Tejeda requests that this Court grant his renewed motion for a mistrial and thereby permit fairness to triumph over efficiency.

Respectfully Submitted,

WILLIAM TEJEDA

By his attorneys,
**/s/ David J. Apfel**
David J. Apfel (BBO # 551139)
Jennifer W. Fischesser (BBO # 651480)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617-570-1000
dapfel@goodwinprocter.com

Dated May 12, 2005
LIBA/1538870.1