UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )  Crim. No. 04-10098-WGY |
| CARMEN FIGUEROA and | ) |
| WILLIAM TEJEDA, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT WILLIAM TEJEDA'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR A NEW TRIAL**

William Tejeda's conviction cannot stand. There are at least three grounds, each of which is independently sufficient, to compel a new trial:

First, the throat-slitting gesture allegedly made by Mr. Tejeda's grandfather, which was observed by two jurors and discussed by all the jurors, irrevocably tainted the jury. The Court's denial of Mr. Tejeda's repeated motions for a mistrial based on the impossibility of the jurors deciding the case based solely on the evidence compromised Mr. Tejeda's right to a fair trial.

Second, the Court's denials of Mr. Tejeda's motions to sever his trial from that of co-defendant Carmen Figueroa, and its denials of his motions to bifurcate his case-in-chief from that of Ms. Figueroa likewise compromised Mr. Tejeda's right to a fair trial and subjected him to severe and undue prejudice. Here, as in the case of *United States v. Johnson*, 478 F.2d 1129 (5th Cir. 1973), where the Fifth Circuit reversed the defendant's conviction and remanded for a new trial, the government's best evidence against Mr. Tejeda came in through his co-defendant's antagonistic testimony. The jury's consideration of Ms. Figueroa's cross-examination testimony in its deliberations as to Mr. Tejeda unquestionably prejudiced Mr. Tejeda, unduly and unfairly.

Thus, the Court's failure to sever or bifurcate the defendants' antagonistic cases was an abuse of discretion.

Third, the prejudicial spillover Mr. Tejeda undoubtedly suffered from the admission of abundant testimony concerning the extraordinary brutality and violence of Manuel Mendes and the Mendes family – evidence which was wholly unrelated to the drug conspiracy alleged in this case – deprived Mr. Tejeda of his right to a fair trial. Beginning with the first line of the government's opening statement, in which the prosecution observed that Manuel Mendes's brother Danuel had been "shot in the head" and killed, and continuing through the testimony of Ms. Figueroa about rape, humiliation and personal degradation, violence and retribution, all irrelevant as to Mr. Tejeda, were centrally featured in the evidence. Especially when considered in connection with the observed throat-slitting gesture, it is apparent that despite the Court's limiting instructions, Mr. Tejeda was inevitably linked in the minds of the jurors with the brutality and violence associated with Manuel Mendes and his family. This inevitable spillover would have (and should have) been avoided if the Court had granted either Mr. Tejeda's motion to sever or his motion to bifurcate.

Finally, the combination of the throat-slitting gesture, co-defendant Figueroa's antagonistic testimony, and the sordid, pervasive evidence of the brutality and viciousness of the Mendes family, had a synergistic prejudicial effect on Mr. Tejeda's right to a fair trial. Whereas each of the three asserted grounds for relief is independently sufficient to require a new trial, the aggregation of the three in Mr. Tejeda's trial stands as a fourth ground.

Fed. R. Crim. P. 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Under Rule 33, a new trial 'in the interests of justice' may be granted liberally on a motion made 'within 7 days' after the verdict." *Conley v. United States*,

323 F.3d 7, 10 (1st Cir. 2003). The district court "has broad discretion to grant a new trial." *Trenkler v. United States*, 268 F.3d 16, 24 (1st Cir. 2001). Where, as here, the defendant's conviction would be a "miscarriage of justice," a new trial is warranted. *United States v. Rothrock*, 806 F.2d 318, 322 (1st Cir. 1986) (quotation marks and citation omitted). Under the circumstances, the Court should set aside Mr. Tejeda's tainted conviction. The only cure is a new trial.

**I.    THE OBSERVED THROAT-SLITTING GESTURE AND THE JURY'S DISCUSSION OF THE GESTURE IRREVOCABLY TAINTED THE JURY AND REQUIRES A NEW TRIAL.**

A criminal defendant's fundamental right to a fair trial requires a jury that is both impartial and "capable and willing to decide the case solely on the evidence before it." *United States v. Gaston-Brito*, 64 F.3d 11, 13 (1st Cir. 1995). Here, Mr. Tejeda's right to a fair trial was irrevocably compromised by the throat-slitting gesture that two jurors reportedly observed Mr. Tejeda's grandfather make on Wednesday, May 4, 2005. The impact of the observed gesture was not limited to the two jurors who reportedly saw it. One of the observing jurors described the gesture to the entire jury in the context of a discussion about whether or not she should report what she had seen. The gesture was then reported to the Court during the morning recess on Friday, May 6, 2005.[1] Mr. Tejeda moved orally for a mistrial as soon as the gesture was brought to the parties' attention by the Court, and later formalized the motion in writing (Dkt. Nos. 99 & 105).[2]

As the First Circuit observed in *Gaston-Brito*, 64 F.3d at 13, a case in which the government's Case Agent, while seated in the courtroom, was observed making a hand signal

---

[1]    Trial was not held on the intervening day, Thursday, May 5, 2005.

[2]    Mr. Tejeda incorporates herein by reference all the arguments he has previously advanced in support of his Motion for Mistrial (Dkt. No. 99), Renewed Motion for Mistrial (Dkt. No. 105) and all mistrial motions and renewed mistrial motions made orally in court.

3

pointing to the defense table, "[a]ny unauthorized communication between jurors and persons associated with the case is presumptively prejudicial." *Id*. at 13. Unless proven harmless, extraneous communication, like the throat-slitting gesture, must result in a new trial. Here, if anything, the Court's *voir dire* of the jurors established beyond any reasonable doubt that the throat-slitting gesture, far from being harmless, was actually harmful and prejudicial to Mr. Tejeda. Although the jurors protested to their ability to remain fair and impartial, during *voir dire* each of the jurors (with only one exception) made clear that he/she was fully aware of the throat-slitting gesture, and that the jury would not be able to simply put the gesture out of its collective consciousness in deciding Mr. Tejeda's case. In this regard, the *voir dire* responses of six of the twelve deliberating jurors were particularly instructive:

- *Juror No. 11* – This juror observed the throat-slitting gesture. At first, she found it "disconcerting, " but did not say anything. Two days later, after hearing Detective Sergeant Sean Balcom's testimony concerning his observation of the three individuals in the back of the courtroom (including Mr. Tejeda's grandfather) in or next to a "red van" that was prominently featured in the case, Juror No. 11 felt "really uncomfortable." She informed all of the other jurors about the gesture and decided that it had been a "very deliberate thing." When asked by the Court whether the matter continued to concern her, Juror No. 11 paused for at least five seconds before responding that she continued to find the gesture deeply troubling. Although this juror stated that she believed she could put the gesture out of her head and be fair and impartial to the government and to the two individual defendants, her body language as well as the tone and substance of her other comments belied her stated belief.

- *Juror No. 30* – This juror stated that the gesture "puts pressure on the jury."

- *Juror No. 14* – This juror was left with the impression that the grandfather's throat-slitting gesture had been directed *at* Juror No. 11. As explained by Juror No. 14, although she did not see the gesture herself, her belief, based on the description of the incident that she heard from Juror No. 11, was that the grandfather had looked directly at Juror No. 11 and Juror No. 11 had looked directly back at him and he had then made the throat-slitting gesture. When asked by the Court what she made of the matter, Juror No. 14 stated that she was concerned with "safety and other things."

- *Juror No. 22* – Based on Juror No. 11's comments, this juror concluded that the throat-slitting gesture had at least looked like a "deliberate motion."

- *Juror No. 1* – This juror stated that the throat-slitting gesture had been "very disconcerting" to the people who saw it. She further stated that it was her assumption

4

> that the gesture had been made by a person related to or known by one of the individual defendants.

- *Juror No. 9* – This juror reported that Juror No. 11 had explained that she had seen a person in Court make a gesture "to her" or "at her." According to Juror No. 9, this was the way Juror No. 11 explained it. After hearing Juror No. 11's explanation, Juror No. 9 told her that she "must report it."

Given the dramatic nature of the throat-slitting gesture, and the context in which it was recounted to the non-observing jurors (*i.e.*, in the middle of Sgt. Balcom's testimony, and just after he had specifically linked the gesturer to the red van and, through the red van, to Mr. Tejeda), it would have been impossible for any juror to put it out of his or her mind. Here, however, we need not guess as to whether the jurors were able to accomplish the impossible. We know from the *voir dire* responses of the six jurors recounted above that at least those jurors were not going to be capable of disregarding the gesture in deciding Mr. Tejeda's fate. Thus, regardless of whether the jurors were being honest with themselves or with the Court when they stated that they could remain fair and impartial, Mr. Tejeda's due process right to have his case decided "solely on the evidence," *Gaston-Brito*, 64 F.3d at 13, was compromised and undermined.

It should also be noted that the *voir dire*, in and of itself, heightened the concerns of *all* of the jurors, not just the six jurors identified above. The safety measures taken by the Court – namely, the removal of Mr. Tejeda's grandparents from the courthouse vicinity for the remainder of the trial and the assurance to the jurors that their anonymity would be safeguarded – were explained to several jurors during the *voir dire* and further served to heighten anxiety by signaling to the jurors that the observed gesture was serious and worthy of fear. Particularly in a case such as this, where the fear and trepidation instilled in others by an individual who was locked behind bars (*e.g.*, Manuel Mendes) was a central issue, banishing Mr. Tejeda's frail, 85-

5

year-old grandfather from the courthouse could not have alleviated the jurors' fears about what Mr. Tejeda's grandfather could cause *others* to do.

Furthermore, testimony concerning a "red van," which played a prominent role in the trial was given before and after the throat-slitting gesture was reported to the Court. The testimony linked *both* Mr. Tejeda *and* his grandfather to the van, leaving no doubt that the jurors would draw a connection between Mr. Tejeda and the man observed making the throat-slitting gesture. Indeed, it was Detective Sergeant Sean Balcom's testimony concerning his observations of Mr. Tejeda's grandfather getting into or standing next to the red van in front of the courthouse that prompted the foreperson of the jury (Juror No. 11) to discuss her observations of the throat-slitting gesture with all of her co-jurors and then to report the incident to the Court. It was the linking of Mr. Tejeda's grandfather to the red van, and thus to Mr. Tejeda and drug trafficking activity, that transformed the foreperson's discomfort concerning her observations into something much greater. As she put it when questioned by the Court, as soon as she heard Sgt. Balcom's testimony, it caused her to "now… really feel uncomfortable."[3]

Just after Juror Nos. 11 and 6 were *voir dired* by the Court about the throat-slitting gesture, another government witness, Amanda Eldridge, testified to the effect that the red van was a place where the source of supply for the Mendes drug operation conducted drug transactions. During her testimony, the government prominently displayed a photograph of the red van on a large screen for more than 30 minutes. In addition, the prejudice from the throat-slitting gesture was further exacerbated when the government elicited testimony from

---

[3] Of all the jurors, Juror No. 11 was the person most directly affected and prejudiced against Mr. Tejeda by the throat-slitting gesture. There can be little question that she should have been excused from the jury, and Mr. Tejeda so moved prior to the commencement of deliberations. Not only was this motion denied, but Juror No. 11 stayed on the jury as its foreperson. This, in and of itself, constituted a denial of Mr. Tejeda's right to due process, and requires a new trial.

6

Ms. Eldridge about a "feeling" she had one day while riding in the red van with a man she identified as Mr. Tejeda that the man was going to kill her. The prompt juxtaposition of Ms. Eldridge's testimony about her fear of death at the hands of Mr. Tejeda to the Court's *voir dire* of Juror Nos. 11 and 6 likely cemented in the minds of at least those jurors the severely prejudicial link between and among Mr. Tejeda, the red van, and the man in the back of the courtroom. That man, like Mr. Tejeda, had been seen with the red van, and that man, again like Mr. Tejeda, had done something that others – rightly or wrongly – took to be threatening. In light of the jurors' *voir dire* responses and the prejudicial impact of Ms. Eldridge's testimony concerning her fear of death, Mr. Tejeda renewed his motion for mistrial both orally and in writing (Dkt. No. 105). The Court denied the renewed motion.

     Finally, lest there be any doubt as to the unduly prejudicial link between Mr. Tejeda and the man who made the observed throat-slitting gesture, the government further cemented the link in its closing. The closing in large measure focused on evidence concerning Mr. Tejeda driving and getting in and out of the red van. That much was fair and appropriate. But the closing also highlighted Sgt. Balcom's testimony concerning his observation of the red van right outside the courthouse in connection with this case. In other words, it highlighted the very testimony that linked Mr. Tejeda to his grandfather, the observed maker of the throat-slitting gesture, and the very testimony that caused Juror No. 11 to feel great trepidation and to report the throat-slitting gesture to her co-jurors and ultimately to the Court. Thus, the government exploited and undoubtedly exacerbated Juror No. 11's and the other jurors' fear of the gesture while at the same time tightening the connection between the extra-judicial fear and Mr. Tejeda. The highlighting of Sgt. Balcom's testimony served as a reminder to the jury of the throat-slitting gesture and effectively directed the jurors to consider it in their deliberations concerning the

other man, *i.e.*, Mr. Tejeda, who had been observed using the red van.  As a result of the government's exploitation of the throat-slitting gesture in its closing, Mr. Tejeda once again moved for a mistrial.  This motion, like its predecessors, was denied.

"[D]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."  *Gaston-Brito*, 64 F.3d at 13 (quotation omitted).  Mr. Tejeda respectfully submits that the Court's error in failing to grant a mistrial when faced with the impossibility of the jurors' deciding the case based solely on the evidence amounts to a denial of due process and a miscarriage of justice warranting a new trial.

**II.     FAILURE TO SEVER MR. TEJEDA'S TRIAL OR TO BIFURCATE HIS CASE-IN-CHIEF FROM THAT OF CO-DEFENDANT FIGUEROA UNDULY PREJUDICED MR. TEJEDA AND REQUIRES A NEW TRIAL.**

Mr. Tejeda's conviction amounts to a miscarriage of justice for the separate and independent reason that he was forced to stand trial with co-defendant Figueroa.  Prior to trial, Mr. Tejeda moved unsuccessfully to sever his trial from that of all of his co-defendants because of the likelihood of spillover prejudice.  *See* Defendant William Tejeda's Memorandum of Law in Support of Motion to Sever, and Request for Oral Argument on Motion (Dkt. No. 70).  Mr. Tejeda renewed his severance motion orally just prior to the commencement of the trial on the precise ground that he would be unduly prejudiced by the then anticipated antagonism between his defense and that of Ms. Figueroa.  The renewed motion was also denied.  Then, during the trial, in an effort to salvage a fair trial before Ms. Figueroa testified, or otherwise commenced her case-in-chief, Mr. Tejeda filed a written Motion to Bifurcate his Case-in-Chief from that of

Defendant Figueroa (Dkt. No. 104).[4]  That motion, too, was denied, as was Mr. Tejeda's request for reconsideration and his request for an offer of proof from Ms. Figueroa's counsel regarding her anticipated answer to the government's cross-examination question of whether she could identify Mr. Tejeda as the "dude from New York."[5]

The identification testimony elicited by the government while cross-examining Ms. Figueroa – that Mr. Tejeda was the "dude from New York" – exposed the antagonism between the defendants' defenses and permitted the government to enjoy a windfall benefit.  Per the Fifth and Sixth Amendments, the government was precluded from calling Ms. Figueroa as a witness in its case-in-chief.  The fortuity of a joint trial of Mr. Tejeda and Ms. Figueroa should not have enabled the government to obtain through co-defendant's case what it could not obtain through its own.  *Cf. United States. v. Figueroa*, 618 F.2d 934, 940 (2nd Cir. 1980) (the advantages to the prosecution of a joint trial do not include being able to introduce evidence as to one defendant on grounds available, if at all, as to co-defendants).  The proposed bifurcated procedure would have precluded the government from introducing evidence against Mr. Tejeda that it was constitutionally barred from introducing during its case-in-chief, thereby protecting Mr. Tejeda's right to a fair trial.

In joint trials, the Court has an ongoing duty to sever if undue prejudice appears.  *See, e.g.*, *Schaffer v. United States*, 362 U.S. 511, 516 (1960); *Johnson*, 478 F.2d at 1132.  Here, in contravention of that duty, the Court rejected the suggested bifurcation procedure, *i.e.*, a

---

[4]  Mr. Tejeda incorporates herein by reference all the arguments he has previously advanced in support of his Motion to Sever (Dkt. Nos. 43, 70), Motion to Bifurcate his Case-in-Chief from that of Defendant Figueroa (Dkt. No. 104), and all bifurcation motions and renewed bifurcation motions made orally before the Court.

[5]  The Court may have unintentionally exacerbated the unfair prejudice to Mr. Tejeda from Ms. Figueroa's identification testimony by abruptly and harshly – in open view of the jury – dismissing counsel's request for an offer of proof and asking, indeed all but ordering and directing, Ms. Figueroa to answer the identification question and to point to Mr. Tejeda as the "dude from New York."

9

procedure that other courts have successfully utilized to maximize efficiency while protecting against undue prejudice and preserving fundamental fairness.  *See*, *e.g.*, *United States v. Joshi*, 896 F.2d 1303, 1306-09 (11th Cir. 1990) (bifurcation employed to avoid taint of co-defendants' testimony potentially implicating another defendant).

The Fifth Circuit's decision in *Johnson*, 478 F.2d 1129 is particularly instructive as to the reasons why severance or bifurcation was necessary in this case.  Here, as in *Johnson*, the principal defense of one defendant (Mr. Tejeda) was non-involvement, whereas that of the co-defendant (Figueroa) was lack of intent.  *Id*. at 1132.  The potential antagonism between those defenses manifested itself during the government's cross-examination of Ms. Figueroa.  As in *Johnson*, the government's best evidence against Mr. Tejeda came in through his co-defendant's testimony.  *Id*. at 1133.  The Fifth Circuit reversed the defendant's conviction and remanded for a new trial.  So it must be here.  The jury's consideration of Ms. Figueroa's cross-examination identification testimony – the government's best evidence against Mr. Tejeda – subjected Mr. Tejeda to severe and unfair prejudice and resulted in a miscarriage of justice.  Mr. Tejeda is entitled to a new trial in which the government does not receive the windfall benefit of his co-defendant's antagonistic defense.

### III. **THE SPILLOVER PREJUDICE MR. TEJEDA SUFFERED FROM PERVASIVE TESTIMONY ABOUT THE BRUTALITY AND VIOLENCE ASSOCIATED WITH MANUEL MENDES AND HIS FAMILY REQUIRES A NEW TRIAL.**

As discussed above, Mr. Tejeda moved prior to trial for a severance based in part on the prejudicial spillover that would inevitably result from the affirmative evidence to be presented by Ms. Figueroa in support of her duress defense.  The motion was denied.  Predictably, the evidence offered by Ms. Figueroa – which was entirely irrelevant as to Mr. Tejeda and largely inadmissible against him – included dramatic and emotional accounts of restraining orders, rape and extraordinary intimidation amounting to torture at the hands of Manuel Mendes.  The jury

10

was presented with a vivid portrait of a brutal, inhuman individual who inflicted unthinkable punishment on the mother of his children for failing to obey his wishes. The admission of such voluminous evidence concerning the extraordinary brutality and violence associated with the leader of the Mendes drug conspiracy unfairly associated Mr. Tejeda with that violence and improperly heightened the jury's condemnation of Mr. Tejeda. *See generally Figueroa*, 618 F.2d at 945-48 (noting different nature of Rule 403 inquiry in particular context of joint trial and holding defendants were entitled to new trial because of risk of prejudice to them from introduction of prior crime evidence offered against their co-defendant).

      The pervasive evidence of cruelty and viciousness, all irrelevant as to Mr. Tejeda, was not limited to the evidence presented in support of Ms. Figueroa's duress defense. From the very first line of the government's opening statement, in which the government observed that Manuel Mendes's brother Danuel had been "shot in the head," violence and retribution, wholly irrelevant and/or unduly prejudicial as to Mr. Tejeda, were themes that played a prominent role at trial. For instance, as noted above, Amanda Eldridge testified about the fear she experienced on one visit to the Bronx that Mr. Tejeda was going to kill her. Ms. Eldridge also testified that she believed Christopher Custer, another alleged co-conspirator, had something to do with the murder of Danuel Mendes. And several witnesses testified about Manuel Mendes's reputation for violence. The persistent and powerful evidence concerning abusive, violent behavior, virtually all of which was wholly unrelated to the charged drug conspiracy, undermined the effect of the Court's limiting instructions concerning the use of such testimony and compromised Mr. Tejeda's right to a fair trial. *See, e.g.*, *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) ("It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together.") (Jackson, J., concurring).

Here, a severance should have been granted because of the "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "[W]hen evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant," *id*., severance is appropriate. Particularly when combined with the throat-slitting gesture observed by two jurors and brought to the attention of the entire jury, first by the reporting juror and then by the Court during individual *voir dire*, the spillover prejudice to Mr. Tejeda from the evidence concerning the atrocities and violence associated with Manuel Mendes and his family, resulted in a miscarriage of justice and requires a new trial.

### IV.  THE COMBINATION OF THE THREE ASSERTED GROUNDS FOR RELIEF NECESSITATES A NEW TRIAL.

Even if no one of the three asserted grounds for relief were "independently sufficient to necessitate a new trial," the combination of all three compels the conclusion that a new trial is required "in the interests of justice." Fed. R. Crim. P. 33. When one combines the jurors' observations of and reactions to Mr. Tejeda's grandfather's throat-slitting gesture, with the unfairly prejudicial, antagonistic testimony of Ms. Figueroa that would not have been available to the government absent the joint trial, and the evidence of Manuel Mendes's and his family's violence and brutality, and the government's opening line about Mr. Mendes's brother being "shot in the head," it is apparent that Mr. Tejeda's right to a fair trial was irreparably compromised. Fear and other improper emotions, together with the antagonistic testimony of Mr. Tejeda's co-defendant, operated to the undue disadvantage and prejudice of Mr. Tejeda. The Court should set aside Mr. Tejeda's conviction as a miscarriage of justice and start the trial afresh.

## CONCLUSION

In light of the throat-slitting gesture observed to have been made by Mr. Tejeda's grandfather, the denial of Mr. Tejeda's motions for severance and bifurcation in the face of antagonistic testimony from co-defendant Figueroa, and the undue spillover prejudice from pervasive – though largely irrelevant – testimony concerning the appalling brutality and violence of Manuel Mendes and his family, as well as the combined effect of all three, the Court should grant Mr. Tejeda a new trial.

Respectfully Submitted,

WILLIAM TEJEDA

By his attorneys,

/s/ David J. Apfel
David J. Apfel (BBO # 551139)
Jennifer W. Fischesser (BBO # 651480)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617-570-1000
dapfel@goodwinprocter.com

Dated: May 27, 2005

## LOCAL RULE 7.1(A)(2) CERTIFICATE

I, David J. Apfel, hereby certify that pursuant to Local Rule 7.1(A)(2), I engaged in a good faith attempt to eliminate or narrow the issues raised in the above motion, but my efforts were unsuccessful. After consultation, Assistant U.S. Attorney Susan Poswistilo would not assent to Mr. Tejeda's motion for a new trial.

/s/ David J. Apfel
David J. Apfel

LIBA/1550171.3