UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) |
|  | ) Crim. No. 04-10098-WGY |
| CARMEN FIGUEROA and WILLIAM TEJEDA, | ) |
| Defendants. | ) |

## DEFENDANT WILLIAM TEJEDA'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR A NEW TRIAL

The government's opposition brief confirms that the Court should grant William Tejeda a new trial. The government advances four main arguments in support of its opposition. All of those arguments are unpersuasive.

First, the government submits that the Court appropriately found the jury was untainted by Mr. Tejeda's grandfather's throat-slitting gesture, primarily because any link between Mr. Tejeda and his grandfather was not apparent to the jurors. This is plainly incorrect. The testimony of the government's lead witness – Det. Sgt. Sean Balcom – linking both Mr. Tejeda's grandfather and Mr. Tejeda to the "red van" allegedly connected with the drug operation conclusively established the link. Moreover, the statement of the jury foreperson that she "really fe[lt] uncomfortable" after hearing the testimony – in fact, so uncomfortable that she reported the gesture to her co-jurors and ultimately to the Court – confirms that, in the minds of the jurors, the link was inescapable. Given the jurors' inability to decide Mr. Tejeda's case based solely on the evidence, he is entitled to a new trial.

Second, the government contends that Mr. Tejeda was not entitled to a severance from Ms. Figueroa because the two co-defendants' defenses were not so antagonistic as to require it. This argument is not persuasive. The cases relied upon by the government are inapposite as none of them required a defendant, like Mr. Tejeda here, to withstand the severe and undue prejudice brought on by a co-defendant's inculpatory testimony that would not have been available to the government absent the joint trial. Furthermore, the government is simply mistaken that Mr. Tejeda did not raise the antagonism issue prior to trial. As for bifurcation, it is irrelevant that some courts have found the procedure to violate the rights of a co-defendant about whom the jury deliberated after having concluded its deliberations as to another defendant. Here, Ms. Figueroa assented to the proposed bifurcation procedure. Thus, any possible prejudice that may have flowed to her from bifurcated deliberations was waived. What is more, Mr. Tejeda does not take the position that bifurcation is either "favored" or "mandatory." Regardless of whether the procedure is a "favored" one, it is appropriate for use in certain circumstances, as shown in the cases Mr. Tejeda has previously cited. Refusing to employ either severance or bifurcation in this case was an abuse of discretion because the government's best evidence against Mr. Tejeda was Ms. Figueroa's cross-examination identification testimony – a windfall benefit which the government would not have obtained but for the fortuity of a joint trial and Ms. Figueroa's antagonistic defense.

Third, the government disregards the extraordinarily powerful effect that the testimony about the violence and brutality of the Mendes family inevitably had on the jury. The jury was inundated with overwhelming evidence of abuse and violence, which was entirely irrelevant as to Mr. Tejeda. Simultaneously, the jury was aware of the violent throat-slitting gesture which, although also irrelevant to Mr. Tejeda's guilt or innocence, was inexorably linked to Mr. Tejeda

and inevitably colored the jurors' deliberations. The government's contention that the Court's limiting instructions were sufficient to cure any potential spillover prejudice is naïve at best.

Finally, the government appeals to convenience in its attempt to overcome the powerful synergistic effect of Mr. Tejeda's three asserted grounds for relief, arguing that the "overwhelming" evidence against him counsels against requiring multiple witnesses to return to participate in a second trial. Justice, however, must trump convenience, and where, as here, a combination of trial errors unmistakably subjects a defendant to undue prejudice and operates to deprive him of his right to a fair trial, a new trial is warranted.

In accordance with Fed. R. Crim. P. 33, the Court should grant Mr. Tejeda's Motion for a New Trial "in the interest of justice."

## I. THE JURORS UNDENIABLY LINKED THE THROAT-SLITTING GESTURE TO MR. TEJEDA AND WERE INCAPABLE OF DECIDING HIS CASE BASED SOLELY ON THE EVIDENCE.

The government contends that Mr. Tejeda had a fair trial despite the throat-slitting gesture observed by two jurors and reported to and discussed by the entire jury. Opposition to Defendant William Tejeda's Motion For a New Trial ("Opp.") at 1-4. This contention is based on the false predicate that there was no apparent link between the man observed to have made the threatening gesture, Mr. Tejeda's grandfather, and Mr. Tejeda. Because there was a powerful and obvious link between the gesturer and Mr. Tejeda, Mr. Tejeda's right to a fair trial was irrevocably compromised.

The government correctly notes that the gesturer was not specifically identified to the jury as "Mr. Tejeda's grandfather." Opp. at 2. While the jurors may not have been aware of the precise familial relationship between the two men, the link between them was inescapable. Indeed, testimony of the lead government witness, Det. Sgt. Sean Balcom, linked *both* Mr. Tejeda *and* his grandfather to the "red van," which the government contended throughout the

3

trial was the vehicle in which Mr. Tejeda drove and in which he conducted his cocaine transactions.

Det. Sgt. Balcom pointed to Mr. Tejeda's grandfather – the individual whom two jurors had observed making the throat-slitting gesture – and identified him as a person whom the officer had seen getting into or out of the red van right in front of the courthouse in connection with this case. When one juxtaposes this testimony to the fact that virtually every witness in the trial spoke of either seeing Mr. Tejeda in the red van or purchasing drugs from him in the red van, it is inescapable that Mr. Tejeda was inextricably linked to the throat-slitting gestures. Two plus two equals four. And Mr. Tejeda and his grandfather were linked. It would not have taken a rocket scientist to make the connection.

Indeed, here there is no need to speculate about whether the jurors connected the throat-slitting gestures to Mr. Tejeda. As reported by the foreperson of the jury (Juror No. 11) to the Court during *voir dire*, it was Det. Sgt. Balcom's testimony connecting Mr. Tejeda's grandfather to the red van that prompted her to "now … really feel uncomfortable" and report her observations to her fellow jurors and ultimately to the Court. Furthermore, the government is mistaken in its assertion that "[n]o juror stated that he or she associated the gesture with either defendant Tejeda or defendant Figueroa." Opp. at 3. To the contrary, the Court had the following exchange with Juror. No. 1:

> THE COURT:   Do you relate this gesture to anything going on in the trial?
>
> JUROR NO. 1:   *Ah, I'm assuming it was someone that one of the defendants knew.* But since I didn't see the gentleman, I couldn't say, no.

Transcript of Voir Dire of Juror #1, May 10, 2005 at 3-4 (attached hereto as Exh. A) (emphasis added).

4

Moreover, as set forth in Mr. Tejeda's opening memorandum, the link established by Det. Sgt. Balcom's testimony between and among Mr. Tejeda's grandfather, the red van, Mr. Tejeda and the charged drug activity was further cemented through the testimony of Amanda Eldridge and the government's closing argument. *See* Defendant William Tejeda's Memorandum of Law in Support of His Motion for a New Trial ("Mem.") at 6-7 (summarizing prejudicial impact of Ms. Eldridge's testimony about her fear of death at the hands of Mr. Tejeda while riding in the red van and the government's accentuation of Det. Sgt. Balcom's testimony concerning the red van during closing). The government's assertions that there was no apparent link between Mr. Tejeda and the man observed to have made the threatening throat-slitting gesture must be soundly rejected.

In further support of its argument that Mr. Tejeda's right to a fair trial was not compromised, the government relies on the fact that the jurors attested to their continued impartiality and on the Court's admonition that the throat-slitting gesture was not to be considered in deliberations. Opp. at 2-3. But even *United States v. Simmons*, the unpublished decision from the Ninth Circuit Court of Appeals on which the government principally relies, recognized that a juror's good faith assurances of impartiality are "not dispositive." 216 F.3d 1085 (Table opinion), No. 99-50381, 2000 U.S. App. LEXIS 8064, at *5 (9th Cir. April 20, 2000); *see also United States v. Shapiro*, 669 F.2d 593, 601 (9th Cir. 1982) ("[E]ven a juror's good faith belief in his own impartiality is not dispositive.") (citing *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1961)). Here, the *voir dire* responses of six jurors made clear that at least those jurors would not be able to disregard the throat-slitting gesture during their deliberations. *See* Mem. at 4-5 (noting, among other things, that Juror. No. 30 stated that the gesture "puts pressure on the jury," that Juror No. 14 stated that she was concerned with "safety and other things" and that

5

Juror No. 1 stated that the gesture had been "very disconcerting" to the people who saw it.). "If a single juror is improperly influenced, the verdict is as unfair as if they all were." *Stone v. United States*, 113 F.2d 70, 77 (6th Cir. 1940).

Dispositive factual distinctions between this case and *Simmons* torpedo the government's attempt to portray the two cases as "nearly identical." Opp. at 3. In *Simmons*, the Ninth Circuit affirmed the trial court's denial of defendant's motion for a mistrial after "a threatening gesture [was] made to the prosecutor by an unidentified member of the public." 2000 U.S. App. LEXIS 8064, at *2. In stark contrast to this case, in *Simmons*, there was but a "tenuous link" between the gesture and the defendant. *Id*. at 7. Critical to the *Simmons* decision was the court's belief "[t]hat the jurors felt frightened means little if they did not link their fright to [defendant]." *Id*. at 5. But in this case, it is plain that the gesture and the feelings of concern and fear associated with it were unmistakably and repeatedly linked to Mr. Tejeda. Here, unlike *Simmons*, that the jurors felt frightened meant a lot, because that fear was pointedly and repeatedly linked to Mr. Tejeda.

The constitutional concern here is that the jury, as a result of the throat-slitting gesture and its aftermath, was demonstrably not "capable and willing to decide the case solely on the evidence before it," a fundamental requirement of the right to a fair trial. *United States v. Gaston-Brito*, 64 F.3d 11, 13 (1st Cir. 1995); *see also United States v. Olano*, 507 U.S. 725, 739 (1993) (ultimate inquiry is whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict"). Given the gesture's unmistakable connection to Mr. Tejeda, its inevitable interference with the deliberation process could not have been effectively cured by the Court's instructions that the jurors not consider the incident in their deliberations and that they decide the case based solely on the evidence. Failing to grant a mistrial under the circumstances denied Mr. Tejeda his right to a fair trial and requires that a new trial be granted in the interest of justice.

II. **DENIAL OF MR. TEJEDA'S MOTIONS TO SEVER AND TO BIFURCATE HIS CASE-IN-CHIEF FROM THAT OF CO-DEFENDANT FIGUEROA REQUIRES A NEW TRIAL.**

There is no merit to the government's contention that Mr. Tejeda has waived his right to argue that his trial should have been severed from that of co-defendant Figueroa by failing to raise the issue of antagonistic defenses prior to trial. Specifically, the anticipated antagonism between the defenses of Mr. Tejeda and Ms. Figueroa was the basis of an oral motion to sever made by counsel for Mr. Tejeda *as soon as* it was apparent that Mr. Tejeda would be proceeding to trial alongside Ms. Figueroa:

> THE COURT: All right. Mr. Tejeda, do you want to go on or go to trial, sir?
>
> MR. APFEL: Mr. Tejeda is going to go to trial, your Honor.
>
> …
>
> MR. APFEL: I would, this is somewhat unexpected as you understand, but I would ask under the circumstances with only two defendants left in the case that Mr. Tejeda's case be severed from that of Ms. Figueroa.
>
> THE COURT: Motion is denied. We'll call for the jury.
>
> …
>
> MR. APFEL: Your Honor, may I be heard on the motion to sever. I believe that Ms. Figueroa is, the nature of the defense as I understand it that she's going to proffer will require her to I believe take, take the stand. She is going to acknowledge her own involvement in this conspiracy including pointing the finger at her co-defendant. Her defense being that she effectively was acting in this conspiracy involuntarily, under the influence of, of Manny Mendes, who has already pled guilty. Under the circumstances this would be enormously, irreversibly prejudicial to Mr. Tejeda.

*See* Trial Transcript Volume I, Excerpt, May 10, 2005 (attached hereto as Exh. B).

Independent of its frivolous waiver argument, the government relies on a litany of cases in an effort to establish that Mr. Tejeda's and Ms. Figueroa's defenses were not so antagonistic as to require severance. Opp. at 6-7. But unlike the instant case, the cited cases do not involve a co-defendant's prejudicial testimony implicating the defendant that would not have been available to the government but for the fortuity of the joint trial and the co-defendant's decision to testify in his or her own defense. *See, e.g.*, *United States v. Rea*, 958 F.2d 1206, 1213 (2d Cir. 1992) ("None of the individual defendants testified at trial."); *United States v. Garrett*, 961 F.2d 743, 746 (8th Cir. 1992) (where neither defendant testified, one defendant maintained that many individuals had access to location where contraband was seized while other defendant generally denied involvement); *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992) (where none of the defendants testified, one defendant argued for severance because overwhelming majority of evidence did not relate to her, and another argued for severance based on quantum of evidence introduced about co-defendant's wealth and disruptive tactics of co-defendants' attorney). The two cited cases in which one or more defendants testified are readily distinguishable because, unlike Ms. Figueroa, the testifying defendants did not inculpate their co-defendants. In *United States v. Arthur*, 949 F.2d 211 (6th Cir. 1991), one defendant confessed to the charged bank robbery while on the witness stand, but testified that his co-defendant "was not involved in the crime in any way." *Id.* at 215; *see also United States v. Zafiro*, 506 U.S. 534, 536 (1993) (two defendants testified that they knew nothing of the charged conspiracy and remaining two defendants did not testify).

Instead, this case bears a striking similarity to *United States v. Johnson*, 478 F.2d 1129 (5th Cir. 1973), where the Fifth Circuit reversed the defendant's conviction and remanded for a new trial. The Fifth Circuit found error in the trial court's failure to sever when it appeared at

8

trial that defendant Johnson could not receive a fair trial alongside co-defendant Smith. *Id*. at 1131-34. Smith took the stand and admitted his involvement in the alleged conduct but denied that he had the requisite intent to defraud. While testifying, he directly incriminated Johnson as the major perpetrator. *Id*. at 1132-33. Johnson, meanwhile, maintained that he had not been involved in the crime. *Id*. The court found these two defense theories to be "directly in conflict," and observed that, "[w]hile Smith would not be highly prejudiced in the presentation of his defense by Johnson's presence at trial, Smith's presence would cause definite hardship to Johnson as he endeavored to prove that he played no part in the crime and was not present when it was committed." *Id*. at 1132. Mr. Tejeda was similarly unduly prejudiced by his co-defendant's identification testimony – the government's best evidence against him – as he sought to demonstrate that he played no part in the charged conspiracy. As in *Johnson*, this prejudice deprived him of a fair trial.

     The government's arguments against bifurcation fare no better than its arguments against severance. The government contends that bifurcation is disfavored because it can be prejudicial to the rights of the non-moving co-defendant. Opp. at 8. The government's cited cases, however, are inapposite as co-defendant Figueroa did not oppose the motion to bifurcate and assented to the proposed bifurcation procedure. *See* Motion to Bifurcate Defendant Tejeda's Case-in-Chief from That of Defendant Figueroa (Dkt. No. 104) at 5. The current case is analogous to *United States v. Zarnes*, 33 F.3d 1454 (7th Cir. 1994), where the court found that the defendant, whose case was decided after the same jury found the co-defendant guilty in a bifurcated proceeding, could not claim denial of his right to an impartial jury because he had consented to the bifurcation procedure. *Id*. at 1471-72; *see also United States v. Joshi*, 896 F.2d 1303, 1306-09 (same).

9

The government has characterized the cases in which bifurcation was allowed as "unusual." Opp. at 8. Unusual or otherwise, the circumstances here warranted severance or bifurcation and refusing to grant either constituted an abuse of discretion. *See, e.g.*, *United States v. Joshi*, 896 F.2d 1303, 1306-09 (11th Cir. 1990) (bifurcation employed to avoid taint of co-defendants' testimony potentially implicating another defendant).

### III. A NEW TRIAL IS REQUIRED BECAUSE OF THE SPILLOVER PREJUDICE FLOWING FROM THE OVERWHELMING TESTIMONY ABOUT THE VIOLENCE OF THE MENDES FAMILY.

The government argues that because the evidence relating to the brutality and violence of the Mendes family was not "complicated or overwhelming," the Court's limiting instructions were sufficient to cure any potential spillover prejudice. Opp. at 9. While the evidence may not have been complex, it certainly was overwhelming. The jury was flooded with evidence of and references to assault, rape and intimidation amounting to torture. This evidence was wholly irrelevant as to Mr. Tejeda. However, because of its persistent and powerful nature and because it was received in the context of the violent throat-slitting gesture which was undoubtedly linked to Mr. Tejeda by the jurors, the jurors could not have effectively compartmentalized the evidence despite having been instructed to consider the prejudicial evidence only when deciding Ms. Figueroa's case. Furthermore, the jury heard evidence from the government that Mr. Tejeda and Mr. Mendes were "mad tight, we're close, we're like this and he crossed his fingers." *See, e.g.*, Transcript of Call No. 1046 at 9, marked for identification at trial as Exhibit N.[1] All the while, Mr. Mendes was being portrayed as a beastly, inhuman individual by co-defendant Figueroa. Juxtaposition of the evidence of Mr. Tejeda and Mr. Mendes' close relationship with the evidence of Mr. Mendes' unthinkable brutality served to improperly heighten the jury's

---

[1] The corresponding recording was introduced at trial as Exhibit 14.

condemnation of Mr. Tejeda in violation of his right to a fair trial. This was not a juxtaposition that could have been – nor was it – cured with instructions from the Court. Vivid oral images of torture – which is what we had in this case – committed by a person described as "mad tight" with Mr. Tejeda, cannot be erased from the mind with a "limiting instruction." The human mind is simply not capable of such feats of segregation and compartmentalization.

### IV.    THE CUMULATION OF ERRORS COMPELS A NEW TRIAL.

The government apparently misapprehends Mr. Tejeda's argument that the combination of the three asserted grounds for relief necessitates a new trial. In opposition to this argument, the government erroneously focuses on what it perceives as the "overwhelming" evidence against Mr. Tejeda. Opp. at 10. Mr. Tejeda is not, however, challenging the sufficiency of the evidence. He is challenging the injustice and unfairness of the process that led to the verdict. That a jury could have convicted him is not the point. The point (and test) is whether a reasonable jury might not have convicted him but for the combination of errors that tainted his trial. On this point, there can be no doubt: But for the errors the result of Mr. Tejeda's trial may well have been different.

As provided in the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Where, as here, a combination of errors operate to *ensure* that a jury will convict a defendant, "injustice" is done even if one assumes that there was sufficient evidence from which a rational jury *potentially could have* convicted. *Cf. United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) ("Courts have based a finding of fundamental unfairness on the cumulative impact of two or more errors. … Courts have also found fundamental unfairness when error is considered in

11

conjunction with other prejudicial circumstances within the trial, even though such other circumstances may not individually rise to the level of error.").

The government expresses concern that witnesses will be inconvenienced if they must testify again in a second trial. But convenience is not the highest virtue. Justice must trump convenience.

## CONCLUSION

Because Mr. Tejeda was convicted by a jury incapable of deciding his fate without considering a threatening gesture made by an individual that the jurors unmistakably linked to him, was unduly prejudiced by his co-defendant's antagonistic defense and suffered severe prejudicial spillover from the testimony concerning the violence of Mr. Mendes and the Mendes family, his right to a fair trial was irrevocably compromised and a new trial is needed to cure the wrong. In the interest of justice, Mr. Tejeda's motion for a new trial should be granted.

Respectfully Submitted,

WILLIAM TEJEDA

By his attorneys,

**/s/ David J. Apfel**

David J. Apfel (BBO # 551139)
Jennifer W. Fischesser (BBO # 651480)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617-570-1000

Dated: June 27, 2005                         dapfel@goodwinprocter.com

LIBA/1560630.3

12