UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | Criminal No. |
| | ) | 04-10098-WGY |
| v. | ) | |
| | ) | |
| **WILLIAM TEJEDA,** | ) | |
| | ) | |
| Defendant | ) | |

**UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANT TEJEDA'S MOTION TO PRECLUDE APPLICATION
OF ENHANCED GUIDELINES PENALTIES FOR CRACK**

The United States of America, by its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, opposes the motion of the defendant, William Tejeda ("Tejeda"), and joined by defendant Carmen Figueroa ("Figueroa"), to preclude application of the enhanced guideline penalties for "crack" cocaine. This memorandum is submitted in support of such opposition.

**STATEMENT OF THE CASE**

On or around April 20, 2005, the grand jury returned a Second Superseding Indictment, charging the Tejeda, Figueroa and four co-defendants with conspiracy "to distribute, and to possess with intent to distribute, cocaine base, also known as 'crack cocaine,' a Schedule II controlled substance," in violation of Title 21, United States Code, Sections 841 and 846. The Second Superseding Indictment also alleged that the conspiracy involved 50 grams or more of "cocaine base, also known as 'crack cocaine,'" thereby invoking the maximum penalty of life, and a

ten year minimum mandatory term of imprisonment, as set forth in Title 21, United States Code, Section 841(b)(1)(A)(iii).

After a twelve-day jury trial, on May 20, 2005, Tejeda and Figueroa were convicted of conspiring to distribute over 1.5 kilograms of cocaine base.[1]

**EVIDENCE RELATING TO CRACK COCAINE**

At trial, a stipulation was read to the jury which stated, in pertinent part, that the substance seized by the DEA on March 16, 2004 (in New York) was analyzed by chemists at the Drug Enforcement Administration ("DEA") Laboratory in New York, New York, and found to consist of approximately 496 grams of cocaine base. This substance was assigned Exhibit 18 at trial.

A second stipulation was read which stated, in substance, that the drugs seized on March 16, 2004 from co-defendant Christopher Custer's residence at 18 Murphy Road, Hyannis, MA, were also tested by the DEA laboratory and found to consist of approximately 49 grams of cocaine base. This substance was assigned Exhibit 62 at trial.

Three law enforcement witnesses, Sean Balcom ("Balcom"), Brian Guiney ("Guiney") and Peter Flannery ("Flannery"), testified, based on their training and experience, about crack and cocaine powder. Balcom explained that "crack" cocaine is a

---

[1] Defendants Mendes, Custer, Alves and Pavao pled guilty shortly before trial and await sentencing.

"cooked version of powder cocaine," which results in a solid substance that is smoked by the user. (Transcript of proceedings, May 4, 2005, pp. 64-65, hereinafter "Tr., 05/xx/05, p.").[2] He testified that he saw crack "more times than he could count," that he's seen it in training, seized it during arrests, and directed confidential informants to purchase it. Tr., 05/04/05, p.66.

He also described its appearance:

> Crack is a solid substance as opposed to being granular. The closest thing I can describe it as looking like maybe, if you've ever seen hard wax that you would wax skis with or you would wax a surfboard with, you would chip a piece off of that, that would be similar to what crack looks like. And the color varies from off-white to tan to brownish color, generally.

Id. Cocaine powder, Balcom continued, is white, "like baking soda," and similar in appearance to baking soda or flour. Id. Guiney and Flannery likewise testified about the appearance of crack and powder cocaine. Guiney stated that cocaine powder looks like a "white powder substance," whereas crack is a "brown tan or light brown rock-like substance." Tr., 05/13/05, pp. 25-27. Flannery stated that crack is "generally beige. It can be off white. And it's in a rock form." Id., p. 110.

Balcom, Guiney and Flannery were each shown Exhibit 18, the

---

[2]Copies of the relevant pages from the transcript are attached.

3

496 grams seized on the day of the arrest. Each unequivocally stated that it was crack cocaine. In addition, Flannery testified that the 49 grams seized from Custer's residence was crack.

In addition to the law enforcement witnesses, three members of the conspiracy, Amanda Eldridge, Desiree Alves, and Carmen Figueroa, testified about the substance in which they were involved. Eldridge was asked if she had an understanding as to "what type of drugs [she] was getting." After affirming that she did, she testified the drugs were "crack," and that they were in the shape of a disk, similar to a compact disk. Tr., 04/09/05, pp. 98, 109.

Alves described the drug package that she routinely received during the course of the conspiracy as a "round circle, kind of like a disk," "about a half an inch thick." Tr., 05/12/05, p. 53. Not surprisingly, given Balcom's description that crack needs to be cooked, Alves further stated that the disks "looked like the bottom of a pan," that they "had . . . brown circles that a bottom of a pan has inside of it." Id. Her description of the drugs that she repackaged likewise matches the description of crack given by the law enforcement officers. She stated that when she broke the disk into pieces, "chunks, little pieces," came off that were sometimes yellow and sometimes a cream color. Id. at 54.

Finally, Figueroa admitted that she generally packaged up $12,500, and that would buy approximately ½ kilogram of crack. Tr., 05/17/05, p. 6. She admitted that on September 10, 2003, Custer brought over 1,500 grams of crack cocaine to her house. Id. pp. 8, 9.

In short, Tejeda and Figueroa admitted the seized substances were cocaine base, and three law enforcement witnesses and three other witnesses who were personally involved in the conspiracy established that the type of cocaine base involved in the conspiracy was crack.

**The Jury Instructions/Verdict Slip**

During a hearing on May 13, 2005, the Court stated that the question of crack or cocaine base would not be put before the jury. Tr. 05/13/05, p. 149. It stated that it intended to limit the verdict slip to "cocaine base," and would put the question of drug quantity to the jury.[3] Id. At the same time, it precluded Tejeda from offering the testimony of an expert witness based on timeliness grounds. Id. After the Court stated its intentions, Tejeda continued to argue that his expert should be permitted to testify; he did not specifically object to the court's statement that the special verdict form would include

---

[3]The purpose of this memorandum is to deal solely with the question of whether the Court is precluded from sentencing the defendants on the crack guidelines, not the propriety of putting drug amounts under the guidelines before the jury. This brief is not intended to address the drug quantity issue.

only cocaine base. <u>Id.</u>, pp. 149-152. Further, at another hearing later that day, the court reiterated its view that the verdict slip would include only cocaine base. <u>Id.</u>, p. 156. Again, Tejeda did not object, but instead followed up on a discussion regarding the drug quantities that would be presented to the jury. <u>Id.</u>, pp. 157, 159-161.

During the charge conference, the government objected to the courts' limiting of the verdict slip to the words "cocaine base." 5/18/2005, pp. 13-14. The government noted that the indictment referred to crack cocaine, and that the evidence throughout the trial referred to crack cocaine. <u>Id.</u> The court denied the government's request to include crack on the verdict slip, and stated:

> Yes, since I've, since I've reserved and I'm allowing them to put on, . . . but I've said the objection of one is the objection of both, should we get that far, *since I'm going to entertain that issue jury waived, I will do that* . . . But the verdict slip itself is just going to say cocaine base. (emphasis added).

<u>Id.</u> p. 14. The court continued by stating that it would refer to crack cocaine in the jury charge, but not on the verdict slip. <u>Id.</u> Again, Tejeda did not object to the court's statement that the crack issue was considered jury waived; did not object that the verdict slip would mention only cocaine base, and not crack; and did not object to the court's solution of equating cocaine base with crack during the charge.

6

Accordingly, the court thereafter instructed the jury that:

> [f]or our purposes here you may take cocaine base as equivalent with the street parlance crack cocaine, as distinguished now from powder cocaine. What is charged here is cocaine base or crack cocaine. Not powdered cocaine. But you can at least take cocaine base and crack cocaine as the same. But the charge is conspiracy. Conspiracy to possess with intent to distribute cocaine base.

Id. p. 119. Later in the charge, the court instructed the jury as to the specific drug weight the jury was to find, if it found the defendants guilty. Id. p. 130. Once again, Tejeda did not object to the charge, to the court's equating cocaine base with crack or to the verdict slip.

The jury returned a verdict of guilty of conspiracy to possess, with intent to distribute over 1.5 kilograms of cocaine base, against both Tejeda and Figueroa.

**I**

**GIVEN THE ADVISORY NATURE OF THE SENTENCING GUIDELINES, SENTENCING ENHANCEMENTS MAY BE FOUND BY THE <u>DISTRICT COURT BY A PREPONDERANCE OF THE EVIDENCE</u>**

Since the sea change in sentencing brought on by the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 621 (2005), the First Circuit has had numerous occasions to address the ramifications of that decision.

In United States v. Perez-Ruiz, 421 F.3d 11 (1st Cir. 2005), the First Circuit explained that a Sixth Amendment violation would occur if the Guideline system were mandatory and judge-made

7

enhancements resulted in a sentence greater than that which could be imposed based solely on the facts found by the jury. United States v. Perez-Ruiz, 421 F.3d at 14. The Court continued, however, by recognizing that Booker "both created and cured the constitutional error at the same time" by ruling that the Sentencing Guidelines are advisory. Id. at 14-15. Thus, the First Circuit held, under the advisory Guideline system, sentencing enhancements, such as drug quantity, "may be made by a judge alone." Id. at 14.

In the case United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005), the First Circuit again considered enhancements in the context of drug quantity. In that case, the jury was presented with a verdict slip in which it needed to find the defendant guilty of a conspiracy involving "x" weight.[4] With respect to defendant Olivero, the jury returned a verdict of guilty but did not indicate a drug weight. The district court sentenced Olivero at a drug quantity of 499 grams - 1 gram less than the lowest amount presented to the jury. In reversing Olivero's sentence, the First Circuit unequivocally stated that "the district court post-Booker may determine drug quantity for purposes of sentence enhancements under the Guidelines." United

---

[4] Unlike the instant case, the Yeje-Cabrera jury was not asked to find a specific drug weight that followed the guideline weight; rather, it was asked to find the weight corresponding to with the statutory maximum and applicable minimum mandatory sentences, as set forth in 21 U.S.C. § 841(b).

States v. Yeje-Cabrera, 430 F.3d at 23. It stated that the court was, and is, not constrained by the jury's verdict and that the court should find drug quantity by a preponderance of the evidence against the defendant. Id.

The analysis is no different when the enhancement is the type of cocaine base, rather than drug quantity. In another recent First Circuit case, United States v. Medina, 427 F.3d 88 (1st Cir. 2005), defendant Medina was charged with, and found guilty of, possession with intent to distribute over 50 grams of cocaine base. On appeal, the defendant argued that the district court erred when it instructed the jury that in order to convict the defendant under 21 U.S.C. § 841(a)(1) and §841(b)(1)(A)(iii), the government had to prove, *inter alia*, that the controlled substance involved in the case was cocaine base. Instead, the defendant argued, the court should have instructed the jury that the government had to prove that the controlled substance was "crack," and not some other form of cocaine base.

The First Circuit disagreed. It reiterated its previous holding that "21 U.S.C. § 841 regulates exactly what its terms suggest: the possession of any form of 'cocaine base'." Id. at 92.[5] Thus, in order to secure a conviction, the government need

---

[5] In so holding, the Court agreed with Tejeda to the extent that Tejeda continues to advocate that crack is one form of cocaine base. The Court recognized that crack is among the substances regulated by statute. Likewise, the government has not contested that, chemically, crack is but one form of cocaine

9

only prove the controlled substance involved cocaine base; it need not prove to the jury that the substance was in fact crack. Id.

Significantly for the instant case, the First Circuit further stated:

> [t]he definition in the guideline note, however, [ie, that cocaine base as used in the Guideline means "crack"] is only relevant to the court at sentencing under § 2D1.1(c), and not to the jury in coming to a verdict under 21 U.S.C. § 841.

Id. at 92, fn.3

This statement, coupled with the First Circuit's recognition in Perez-Ruiz and Yeje-Cabrera that enhancements are to be found by the court by a preponderance of the evidence, sufficiently puts to rest any argument that the government had to prove the presence of "crack cocaine" to the jury. See also, United States v. Pho, 2006 WL 20574 (1st Cir. Jan. 5, 2006)(constitutional infirmity triggered by judge-found facts in mandatory Guideline system rectified by the now advisory nature of the Guidelines).

## II
## ASSUMING, *ARGUENDO*, TEJEDA HAD A RIGHT TO A JURY FINDING ON THE QUESTION OF COCAINE BASE OR CRACK, TEJEDA WAIVED THAT RIGHT

Tejeda argues in his Memorandum that the government was on notice that the Court required it prove enhancements to the jury,

---

base. Indeed, the nature of its objection to this line of questioning at trial was due to the fact that the law enforcement officers were not chemists.

10

that it did not prove the "crack" enhancement to the jury, and that therefore Tejeda should be sentenced under the cocaine powder Guidelines.[6]

While it is true the court advised the government at the outset that the government would be required to prove sentencing enhancements to the jury, Tejeda effectively ignores the fact that the court's position regarding the crack cocaine issue evolved over the course of the trial, and *that Tejeda did not object when the court took the question from the jury and stated it would be jury waived.*

Indeed, as explained above, on May 13, 2005, the court ruled that Tejeda's expert witness could not be called due to the fact that Tejeda proffered the witness at the eleventh hour. The court, however, was "intrigued" by other decisions in the District of Massachusetts regarding cocaine base and crack, and stated that the court would hear expert testimony at sentencing. Tr., 05/13/05, p. 149. It also stated it would put the question of cocaine base, not crack, before the jury. While Tejeda continued to object that his expert should be permitted to testify, he did not object to presenting the jury with a verdict

---

[6] Pursuant to the Drug Quantity Table found in § 2D1.1 of the Sentencing Guidelines, if a defendant, such as Tejeda, is responsible for 1.5 kilograms or more of crack, he or she has a base offense level of 38 (235-293 months). In contrast, in order for a defendant to have a base offense level of 38 under the cocaine powder guidelines, he or she must be found responsible for 150 kilograms or more of cocaine.

form limited to "cocaine base." Id. at 150-152.

During the charge conference, it was the government, not Tejeda, which objected to the court's failure to put crack on the jury verdict. The court resolved the government's objection by stating that the issue was to be jury waived, and that it would instruct the jury that cocaine base was the equivalent of crack cocaine for purposes of reaching a verdict. While the government continued to press for the verdict slip to state "crack," the court declined to do so. Tr., 05/18/05, p.14. When asked whether he had objections to the proposed charge, Tejeda had numerous objections, but, again, none was an objection to the lack of a jury finding on "crack cocaine."

At trial, the government proved all that it needed to prove to obtain a conviction: it proved that Tejeda and his co-conspirators were trafficking in cocaine base. In addition, beyond the statutory requirements, the government also proved, through the testimony of both the lay and law enforcement witnesses, that the particular form of cocaine base involved in this proceeding was, in fact, crack cocaine. Thus, even if the government were required to prove crack to the jury, as opposed to cocaine base, the government maintains that it did exactly that.[7]

---

[7]Tejeda continues to insist, at footnote 3, p. 5 of his Memorandum, that the DEA chemist found that the drugs seized from Custer's home (Exhibit 62) were identified as "crack" by the DEA

It would indeed serve as a sentencing windfall to Tejeda if the court were to determine that the government "is stuck" with the jury finding of cocaine base. The government put the defendant on notice regarding crack cocaine in the indictment; the government presented its crack evidence to the jury; and the government objected when the court presented the verdict form without seeking a "crack" verdict. During the course of the trial, the court indicated on at least three occasions that it would only present the question of cocaine base to the jury, and that it would consider additional crack evidence at sentencing. At not time did Tejeda object to this. If he had, surely the question of "crack" would have been presented to the jury, and, almost as surely, the jury would have returned a guilty verdict of crack.

---

laboratory. Nothing could be further than the truth. No DEA chemist has called Exhibit 62 "crack." The DEA laboratory report, which is found at p. 37 of TAB 1 of Tejeda's pleadings, is a two-part form. The top part of the form contains information prepared by the agents in submitting the controlled substance to the laboratory; the bottom part of the form contains the chemists' report. The chemist report in this case clearly finds "cocaine base," it does not find crack cocaine.

## **CONCLUSION**

Based upon the First Circuit's opinions in <u>Medina</u>, <u>Yeje-Cabrera</u> and <u>Pho</u>, the question of whether the controlled substance at issue is the form of cocaine base known as crack is one that should be found by the district court at sentencing.  Further, to the extent that this Court requires a jury finding on the crack issue, Tejeda waived any right he may have had to such a finding.  Accordingly, the issue of crack is one that can be decided by the court at sentencing.

                                      MICHAEL J. SULLIVAN
                                      United States Attorney


                By:   /s/ Susan M. Poswistilo
                     SUSAN M. POSWISTILO
                     NANCY RUE
                     Assistant U.S. Attorneys