# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| MANUEL MENDES, | ) Crim. No. 04-10098-WGY |
| CHRISTOPHER CUSTER, | ) |
| CARMEN FIGUEROA, | ) |
| DESIREE ALVES, | ) |
| WILLIAM TEJEDA, and | ) |
| JENNIFER PAVAO, | ) |
| | ) |
| Defendants. | ) |

## SENTENCING MEMORANDUM OF DEFENDANT WILLIAM TEJEDA

William Tejeda is a gentle, compassionate, generous man. He is a hard working man. He comes from a close knit family that remains devoted to him, and he to them. He is a marvelous, dedicated father to his three children. Throughout his adult life he has held legitimate jobs, paid taxes, and been a solid bread winner for his family. He has been a citizen. There is no violence in his character, and he has no prior criminal record. Indeed, prior to the offense for which he stands convicted, Mr. Tejeda had never so much as been arrested or accused of any crime, let alone convicted. That has obviously changed, as he now stands convicted of a serious offense. Justice requires that he be punished. But fairness, as well as the Sentencing Guidelines and the other § 3553(a) factors, requires a sentence of no more than ten years imprisonment. Anything more, particularly a sentence in the range of 19.6 - 24.4 years, the sentencing range the government is expected to recommend, would be cruel, completely unnecessary, and disproportionate to the crime of conviction and Mr. Tejeda's role in it. Any sentence of more than ten years would neither fit the crime nor the criminal.

Ten years is the statutory mandatory minimum sentence for Mr. Tejeda's offense. *See* 21 U.S.C. § 841(b)(1)(A)(iii). It is a harsh and lengthy sentence. It is far more than sufficient to satisfy all the purposes of sentencing for this particular defendant and the particular crime for which he has been convicted. Indeed, but for the statutory mandatory minimum, a ten year sentence would be four to five years more than Mr. Tejeda's advisory guideline sentence, and at least five years more than any sentence merited by the full range of § 3553(a) factors.

Mr. Tejeda requests that he receive the statutory mandatory minimum of sentence of ten years, but no more, for at least the following reasons:

- Under the Sentencing Guidelines, Mr. Tejeda's sentencing range is 63-78 months.

- Mr. Tejeda is a non-violent person, with no prior criminal record.

- The offense of conviction did not involve any weapons or violence. Even if it were a "crack" offense, it is not the sort of "crack" violation that led Congress to impose the 100:1 crack/powder cocaine sentencing differential.

- Mr. Tejeda falls within the category of offenders least likely to commit other crimes.

- In light of Mr. Tejeda's non-criminal and non-violent past, his strong family ties, and his relatively modest role in the crime of conviction, the public interest in specific and general deterrence would be more than adequately served by a ten year sentence.

- A sentence of greater than ten years for Mr. Tejeda would create unwarranted disparities between Mr. Tejeda's sentence and (i) the sentences received by similarly situated defendants post-*Booker*, and (ii) the sentences (or absence of any sentence) for several of Mr. Tejeda's more culpable co-conspirators who "cooperated" with the government.

- A sentence of greater than ten years would unnecessarily punish Mr. Tejeda for having exercised his constitutional right to go to trial.

1.  **The Sentencing Guidelines Call For A Sentence of 63-78 Months for Mr. Tejeda.**

We begin with the Guidelines, as we must. *See United States v. Jimenez-Beltre*, --- F.3d ---, 2005 WL 562154 (1st Cir. 2006). Per the Guidelines, Mr. Tejeda has a criminal history

category of I. [*See* PSR at ¶ 105.] As found by the jury, his crime of conviction was conspiracy to distribute cocaine base, and the amount of cocaine base distributed was greater than 1.5 kilograms. [*See* Jury Verdict Form, 5/20/05.] The jury did not find that the conspiracy involved the "crack" form of cocaine base, and although given the opportunity to find a specific amount of cocaine base, it declined to do so. [*See id.*; *see also* Trial Tr. 5/20/05 at 3.] With a criminal history category of I, and a conviction for cocaine base (but not "crack") in an amount greater than 1.5 kilograms, Mr. Tejeda's base guideline sentencing range is 63-78 months. *See* U.S.S.G. § 2D1.1; *see also United States v. Thomas*, 360 F. Supp. 2d 238 (D. Mass. 2005). Furthermore, Mr. Tejeda was not a supervisor, organizer or leader of the conspiracy, and the government has never suggested otherwise. [*See* PSR at ¶¶ 97, 102A.] Accordingly, no enhancement under U.S.S.G. § 3B1.1 applies, nor does any other guideline enhancement apply. [*See* PSR at ¶¶ 96-102A.] Mr. Tejeda's base guideline sentencing range is the same as his final range, namely 63-78 months.

This calculation is, of course, not beyond dispute. The parties' briefs on Mr. Tejeda's pending Motion to Preclude Application of Enhanced Guidelines Penalties for "Crack" in Calculating Defendant's Sentence ("Crack Motion"), as well as the government's submissions to the Probation Department and the PSR, all make clear that there are two major issues the Court will need to resolve in calculating Mr. Tejeda's guideline sentencing range – the first concerns whether the drug at issue was crack, and the second concerns the amount of cocaine base (or crack) for which Mr. Tejeda may be held responsible.

*Cocaine Base v. "Crack" Cocaine* – On this issue, Mr. Tejeda contends that his conviction must be treated as one for cocaine base and not "crack," because the jury did not find that the form of cocaine base involved in the charged conspiracy was "crack." [*See generally*

3

Crack Motion and supporting memoranda.] Without a "crack" finding, the clear directive of this

Court that all sentencing enhancements had to be found by the jury or forfeited, means that

Mr. Tejeda cannot be sentenced under the "crack" guidelines. [*Id.*] The government maintains

that it introduced sufficient evidence that the form of cocaine base involved in the conspiracy

was crack, and that a jury finding to that effect was not necessary. The record belies the

government's position. [*See* Memorandum of Defendant William Tejeda in Support of Motion

to Preclude Application of Enhanced Guidelines Penalties for "Crack" in Calculating

Defendant's Sentence ("Crack Mem.") at 6; Trial Tr. 7/8/05 at 4-5, 7.] The argument will not,

however, be further developed here. The parties' positions have been fully briefed in connection

with Mr. Tejeda's pending Crack Motion, and there is no need to revisit them. It should,

however, be noted that independent of the due process and other concerns advanced in

Mr. Tejeda's briefs, as a purely factual matter the only drug sample associated with Mr. Tejeda

that was seized and introduced into evidence in this case did not test positive for sodium

bicarbonate, the signature ingredient of crack. [*See* DEA Test Results, Tab 1 to Crack Mem., at

5-6.] That drug sample was not identified by the DEA laboratory as "crack." [*Id.* at 13.] In

contrast, another drug sample that was seized from a locked safe in co-defendant's Christopher

Custer's home, and that was never in any direct way linked to Mr. Tejeda, tested positive for

sodium bicarbonate and was identified as "crack" by the government's laboratory. [*See id.* at 37,

40-41.] The import of this distinction is that the real evidence introduced at trial supports Mr.

Tejeda's legal position.

    *The Amount of Cocaine Base* – On this issue, the jury was expressly given the

opportunity to find a specific amount of cocaine base, but chose instead to find an amount

greater than 1.5 kilograms. [*See* Jury Verdict Form, 5/20/05.] The jury did not specify how

much greater, and the government should not now be permitted to fill in the amount by cherry picking the bits and pieces of testimony that best fit its desire to maximize drug weight. *See* Crack Mem. at 2.

Regardless of whether the Court finds for or against Mr. Tejeda on the two principal sentencing issues in dispute, the appropriate sentence for Mr. Tejeda would still be 63-78 months, increased to 120 months by virtue of the statutory mandatory minimum. Consideration of the various § 3553(a) factors makes clear that even if Mr. Tejeda's guideline sentencing range is determined to be as high as 121-151 months (finding of cocaine base, but not crack, in an amount of 5.718 kgms.) or 235-293 months (finding of "crack" in an amount greater than 1.5 kgms.), an appropriate and fair sentence would still be no more than ten years imprisonment.

**2.   18 U.S.C. § 3553(a)(1) (History and Characteristics of the Offender) – Mr. Tejeda's History and Characteristics Do Not Require A Sentence of More Than Ten Years.**

Section 3553(a)(1) directs the Court to consider Mr. Tejeda's "history and characteristics" in determining whether a sentence of ten years would be "sufficient, but not greater than necessary" to punish, deter and rehabilitate Mr. Tejeda. Here, if anything, Mr. Tejeda's "history and characteristics" cry out for a sentence of fewer than ten years. Mr. Tejeda is a first-time offender. He has no prior criminal record and no prior jail experience. He is a family man and has always been a hard worker. [*See, e.g.,* letters of Carmen Rosario (common law wife and mother of Mr. Tejeda's children) and Lirim Mashrulli (former employer), included at Tab A.[1]] He is a peaceful man who has never committed an act of violence. He has never supervised, organized or led any criminal activity, and this case was no exception. According to the evidence, Mr. Tejeda was nothing more than a meeter, greeter, and pick-up post for a drug

---

[1]   The letters written on Mr. Tejeda's behalf, attached at Tab A, will not be filed electronically. Rather, in order to protect the privacy interests of those who wrote them, the letters will be filed in hard copy with the Court.

conspiracy engineered and run by others. There is no evidence that he personally profited from the conspiracy, and no evidence that he ever so much as threatened anyone, let alone hurt anybody directly. [*See* PSR at ¶ 102A (noting that Mr. Tejeda "meets criteria 1-4 of U.S.S.G. § 5C1.2, including the criteria that "defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense").]

In light of his conviction, Mr. Tejeda must be punished, but his personal history and characteristics make him the perfect candidate for a relatively lenient sentence – and ten years certainly cannot be called "lenient." Under the circumstances, a ten year sentence would unquestionably be sufficient. To claim that more is somehow necessary to punish, deter or rehabilitate Mr. Tejeda is nothing short of absurd. This is a good man who has been convicted of doing a bad deed. He is not a person whom we need to lock up and throw away the key.

3.    **18 U.S.C. § 3553(a)(1) (Nature and Circumstances of the Offense) – The Nature and Circumstances of the Instant Offense Do Not Necessitate a Sentence of Greater Than Ten Years.**

A conspiracy to distribute cocaine base, whether "crack" or not, can never be a pretty thing. There are, however, different levels of ugliness when it comes to such conspiracies. On the scale of how bad these conspiracies can be, the nature and circumstances of this one, and particularly Mr. Tejeda's role in it, place it at the relatively benign end:

- No weapons were used.

- There was no violence.

- There were no identifiable victims.

- No minors were corrupted by being used as distributors.

The conspiracy at issue did not involve any of the indicia of dangerousness that led Congress to implement the 100:1 ratio of penalties for "crack" versus other cocaine offenses. *See, e.g.,*

6

United States Sentencing Commission, *Report to the Congress: Cocaine And Federal Sentencing Policy* (May 2002) ("Cocaine Report") at 91-100. Since those indicia were absent, the offense should not be treated as if they were present. Yet that is exactly what the Court would be doing if it were to sentence Mr. Tejeda to anything more than ten years imprisonment.

     4.    **18 U.S.C. § 3553(a)(2)(A) (Need for Sentence to Reflect the Seriousness of the Crime, Promote Respect for the Law, and Provide Just Punishment) – These Sentencing Goals Would Be Readily Achieved By a Ten Year Sentence.**

Mr. Tejeda is a first time offender, who has never committed an act of violence, was not a supervisor, organizer or leader of the offense of conviction, and did not profit from the offense. He is also a family man with three young children – ages 1, 8, and 11 – to whom he is genuinely devoted. To sentence a man like this to ten years imprisonment would reflect the seriousness of his crime, promote respect for law, and serve the interest of justice. To sentence him to more than ten years would, if anything, undercut these goals by breeding bewilderment and fear. Ten years is sufficient for this offender and for this offense. With a ten year sentence, Mr. Tejeda would miss the pre-adolescent years of his youngest two children, but return in time to be a true father to them during their teenage years. This is his dream. He wants nothing more. In contrast, a "crack" guideline sentence would all but guarantee that Mr. Tejeda would not be a father to his children while they are still children. This would be a tragedy for Mr. Tejeda and his children, without in any way, shape or form serving society's interests or the interests of justice.

     5.    **18 U.S.C. § 3553(a)(2)(B) (Need for Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct) – A Ten Year Sentence Would Serve the Interests of Specific and General Deterrence.**

There is no question that a ten year sentence would serve the interests of both specific and general deterrence. With regard to specific deterrence, a ten year sentence would obviously remove Mr. Tejeda from the public for ten years, thus having an immediate and significant

deterrent effect. A ten year sentence would also likely deter Mr. Tejeda from ever again

committing another crime. The comprehensive study released by the United States Sentencing

Commission in 2004 regarding recidivism makes this clear. *See* United States Sentencing

Commission, *Measuring Recidivism: The Criminal History Computation of the Federal

Sentencing Guidelines* (May 2004) ("Recidivism Report"). According to the Recidivism Report:

- Individuals like Mr. Tejeda with no criminal history have substantially lower rates of recidivism than individuals with even minimal criminal records. *Id.* at 6. Indeed, persons such as Mr. Tejeda, who not only have no criminal history, but no prior arrests, are the most empirically identifiable group of offenders who are unlikely to re-offend. *See* United States Sentencing Commission, *Recidivism and the First Time Offender* (May 2004) ("First Offender Report") at 17.

- Mr. Tejeda's age, both his current age (29) and the age he would be upon release in ten years (39), increase the likelihood that he would not re-offend. Recidivism rates are highest for men who are under the age of 21 when their first offense occurs. Those rates decline consistently thereafter. Recidivism Report at 12.

- Individuals like Mr. Tejeda who have long-term, supportive familial relationships are less likely to recidivate. *Id.* at 29. As evidenced by the support Mr. Tejeda received throughout the trial, as well as the letters his family members have sent to the Court (all of which are attached hereto at Tab A), Mr. Tejeda has always been part of a close-knit family. *See* PSR at ¶¶ 118-22.

- Individuals like Mr. Tejeda who were gainfully employed in legitimate jobs during the year prior to their arrest (*see* PSR at ¶¶ 135-41) are far less likely to re-offend than those who were unemployed. Recidivism Report at 29.

- Individuals like Mr. Tejeda who have completed high school are half as likely to recidivate as those who do not have a high school education. *Id.*

- Drug offenders, like Mr. Tejeda, who are sentenced under U.S.S.G. § 2D1.1 are among the least likely to recidivate. *Id.* at 13.

- For first time offenders like Mr. Tejeda, there appears to be no correlation between length of sentence and likelihood of recidivism. *Id.* at 31. This in and of itself suggests that a sentence of ten years for Mr. Tejeda would be more than sufficient as a deterrent to his future criminal conduct.

All indicia of recidivism point to Mr. Tejeda as the perfect candidate to learn from his past

wrongs and never to repeat them.

8

With respect to general deterrence, there can be little doubt that a ten year sentence for a non-violent, first time offender, who played a relatively minor role in a drug conspiracy, would have a strong deterrent effect on others who might otherwise be tempted to engage in illicit drug activity.

6.    **18 U.S.C. § 3553(a)(2)(C) (Need to Protect Public From Further Crimes of Defendant) – A Ten Year Sentence Would More Than Adequately Protect the Public from Any Other Crimes By Mr. Tejeda.**

As noted above, there is relatively little chance that Mr. Tejeda would recidivate. A ten year sentence would, therefore, adequately protect the public from other potential crimes he might commit. As noted, as a general matter, Mr. Tejeda falls within the category of non-violent, first time offenders who are least likely to recidivate. *See, e.g.,* First Offender Report at 17. As a specific matter, Mr. Tejeda has learned his lesson. He desperately wants to be with his wife and children, and to be a good husband and father. He knows that the way to achieve these goals is to avoid future criminal conduct. He is dedicated to doing just that.

7.    **18 U.S.C. § 3553(a)(6) (Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct) – A Ten Year Sentence for Mr. Tejeda Would Be In Line with Sentences Received by Similarly Situated Defendants Since *Booker*.**

In enacting the Sentencing Reform Act of 1984, Congress sought, among other things, "uniformity in sentencing by narrowing the widening disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders." U.S.S.G. § 1A1.1, Commentary ¶ 3. A sentence for Mr. Tejeda of ten years would be very much in the middle of sentences imposed, post-*Booker*, by other federal courts for similar conduct by similar defendants. Accordingly, the proposed sentence would further the goal of achieving uniformity in sentencing. In this regard, four points are worth noting:

9

First, the conduct at issue involved cocaine base, but not "crack" cocaine. In this regard, a ten year sentence would be substantially *above* the applicable guideline range, and *above* sentences typically received in federal court by first time offenders who distribute more than 1.5 kilograms of cocaine. *See, e.g.* U.S.S.G § 2D1.1; *United States v. Davern*, 970 F.2d 1490, 1492 n.1 (6th Cir. 1992); *United States v. Fisher*, 2005 WL 2542916 at *4 (S.D.N.Y. Oct., 11, 2005).

Second, even if the Court determines to treat Mr. Tejeda's conviction as a "crack" offense, involving greater than 1.5 kilograms of crack, federal courts post-*Booker* have routinely given below guideline sentences for individuals like Mr. Tejeda, and even for persons whose criminal histories and/or offense conduct were far more egregious that Mr. Tejeda's.[2] *See* Chart attached hereto at Tab B, collecting representative post-*Booker* "crack" cases in which defendants have received below guideline sentences, without § 5K1.1 motions, and in the face of opposition from the government.[3] In fact, since *Booker* district courts have given below guideline sentences in more than 600 crack cocaine cases. *See* United States Sentencing Commission, *Report on the Impact of United States v. Booker on Federal Sentencing* at 130 (March 2006). Below guideline sentences are typically given in cases, like this one, involving non-violent, first offenders, who come from close-knit, supportive families. The cases of *United*

---

[2]  Most recently, in this case, this court gave co-defendant Christopher Custer, a manager and supervisor of the conspiracy and an individual with an extensive criminal record, a below-guideline sentence. If Mr. Custer merited a below-guideline sentence, *a fortiori* Mr. Tejeda should receive one as well.

[3]  Notably, in the year since *Booker* was decided, more than 33% of sentences in the District of Massachusetts have been below the guideline minimum without government support. *See* United States Sentencing Commission Special Post-Booker Coding Project, dated February 14, 2006 ("Post-Booker Coding Project") at 16. Nationwide, sentencing below the guideline range has similarly been quite common. The median guideline minimum for those sentenced post-Booker under U.S.S.G. § 2D1.1 has been 70 months, while the median actual sentence has been 60 months, a full 10 months (14%) lower. *Id.* at 15. Furthermore, in the more than 2,700 drug trafficking cases in which district courts have chosen to sentence below the guideline range without government support, the median sentence has been 27% lower than the guideline minimum. *Id.* at 21-22.

*States v. Hamilton*, Case No. 6:05-cr-157-Orl-31JGG (M.D. Fla. March 16, 2006) (attached at

Tab C) and *United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005), are illustrative.

*Hamilton* involved a defendant who was convicted of possession with intent to distribute

greater than 50 grams of crack cocaine. *Hamilton* at 1. The defendant received a sentence of 36

months, which represented approximately a 50% reduction from the low end of his otherwise

applicable guideline range. *Id.* In explaining the sentence, the district court noted the

defendant's lack of any significant criminal history, the absence of a violent past, the defendant's

involvement in a loving stable relationship with a woman with whom he had three children, and

the fact that the defendant had been gainfully employed and was supporting his family at the

time of the offense. *Id.* at 5-6. In other words, in explaining his below-guidelines sentence, the

district court judge in *Hamilton* effectively described Mr. Tejeda.

*Nellum* was quite similar. In that case, the district court sentenced the defendant to 108

months for distribution of more than 200 grams of crack cocaine. The sentence was significantly

below defendant's guideline range of 168-210 months. In rendering the below guideline

sentence, the district court judge noted the defendant's age and the unlikelihood that he would

recidivate. *Id.* at 1. The court also noted defendant's family ties, including his strong

relationship with his children. *Id.* at *3-4. For exactly these same reasons, Mr. Tejeda, if

sentenced as a "crack" offender, should receive a substantially below guideline sentence.

Mr. Tejeda's age, as well as his prior history of non-violence and good citizenship, make it

extraordinarily unlikely that he would ever recidivate. *See, e.g.*, Recidivism Report at 17. In

addition, Mr. Tejeda's family connections, and his loving devotion to his children, suggest that

he should receive a sentence no greater than that of the defendant in *Nellum*.

Third, the Sentencing Commission and numerous courts and other legal authorities have noted that the 100:1 crack to powder sentencing ratio is misguided and inappropriate, especially for "crack" offenses that do not involve violence. *See, e.g.,* Cocaine Report, *United States v. Smith*, 359 F. Supp. 2d 771 (E.D. Wisc. 2005); *United States v. Fisher*, 2005 WL 2542916 (S.D.N.Y. Oct. 11, 2005); *United States v. Stukes*, 2005 WL 2560244 (S.D.N.Y. Oct. 12, 2005). Although the First Circuit has recently made it clear in *United States v. Pho*, 433 F.3d 53 (1st Cir. 2006), that district courts may not give non-guideline sentences based *solely* on the categorical rejection of the guidelines' disparate treatment of crack and powder cocaine offenses, it is equally clear that where, as here, numerous other factors militate in favor of a lower sentence, criticisms of the 100:1 ratio may be considered. As the Fourth Circuit recently explained in *United States v. Eura*, 2006 WL 440099 (4th Cir. Feb. 24, 2006), although district courts may not categorically reject the 100:1 crack/powder disparity, where sentencing courts are able to identify individual aspects of a defendant's case that fit within the § 3553(a) factors, downward departures from the otherwise applicable advisory guideline range are warranted. *Id.* at *6. As one panel member, namely Judge Michael, stated in his concurrence, it is appropriate for sentencing judges to consider the criticisms the Sentencing Commission has applied to the 100:1 ratio as part of an individualized § 3553(a) analysis:

> While the Commission's findings alone cannot justify a below-Guidelines sentence, in certain cases they can help sentencing courts analyze the § 3553(a) factors and select a sentence that is 'sufficient, but not greater than necessary' to punish, deter, and rehabilitate the defendant. 18 U.S.C. § 3553(a). The Commission's findings, in other words, can be considered insofar as they are refracted through an individual defendant's case.

*Id.* at *9. Here, we ask nothing more than that this Court refract the Commission's findings concerning the 100:1 crack/cocaine disparity through the lens of Mr. Tejeda's particular case. To do so is to find that ten years would be a more than sufficient sentence. Mr. Tejeda is simply

12

not the sort of "kingpin" offender, and the instant offense – even if it involved "crack" cocaine –
is not the sort of violent, lethal offense that led to the 100:1 crack/powder cocaine disparity in the
first place. *See* Cocaine Report at 99-100.

Fourth, in light of Mr. Tejeda's role in the offense of conviction, he should receive a
sentence substantially lower than most if not all of his co-conspirators. *United States v. Ferrera*,
372 F. Supp. 2d 108, 129 (D. Mass. 2005) The charged conspiracy involved seven co-
conspirators: (i) Manuel Mendes; (ii) Carmen Figueroa; (iii) Christopher Custer; (iv) Jennifer
Pavao; (v) Desiree Alves; (vi) Amanda Eldridge; and (vii) Mr. Tejeda. The government has
designated three of these co-conspirators – Mendes, Figueroa and Custer – as supervisors,
managers, organizers or leaders. As such, their sentences should unquestionably be greater than
Mr. Tejeda's, as no one has ever suggested that he played a leadership role in the conspiracy.[4]
Of the seven co-conspirators, Mr. Tejeda was one of only three (the others being Desiree Alves
and Amanda Eldridge) who did not have any prior criminal record. All of the other co-
conspirators, including Ms. Eldridge who has received immunity and will not be charged, played
more active roles in the conspiracy than Mr. Tejeda, whose role was nothing more than the
designated pick-up spot for the group's activities. [*See, e.g.*, PSR ¶¶ 9-15 (describing roles of the
various co-defendants).] Mr. Tejeda's role in the conspiracy stands in stark contrast to that of all
of the other members, each of whom either initiated drug distribution activity or repeatedly

---

[4]    Notably, with an appropriate proffer, Mr. Tejeda, unlike any of the other co-conspirators with the possible
exception of Ms. Pavao and Ms. Alves, would be "safety valve" eligible. *See* PSR Addendum ¶ 102A
(concluding that Mr. Tejeda meets criteria 1-4 of U.S.S.G. § 5C1.2 and would be "safety valve" eligible if a
determination were made that criteria 5 had been satisfied); *see also United States v. Fuller*, 897 F.2d 1217,
1221 (1st Cir. 1990) (mere fact that defendant dealt with a large quantity of marijuana, in the absence of
evidence of control over or organization of others, did not support finding that defendant was organizer, leader,
manager or supervisor); *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994) ("[B]y itself, being a
distributor, even a large distributor like [defendant], is not enough to support a § 3B1.1 offense level increase.
... Rather, if he was a distributor, the defendant must also have been an organizer, leader, manager or
supervisor of those to whom he distributed.").

traveled hundreds of miles to engage in illegal drug conduct. Furthermore, unlike the other co-

conspirators, each of whom has admitted involvement in the conspiracy and acknowledged

having profited from it, there is no evidence that Mr. Tejeda personally benefited from the drug

sales in which the jury found he had participated.[5]   Under these circumstances, for Mr. Tejeda to

receive a sentence equal to or greater than the sentences meted out to his co-conspirators would

be unfair and would effectively punish Mr. Tejeda for having exercised his right to go to trial.

*Cf. United States v. Green*, 346 F. Supp. 2d 259, 264-65 (D.Mass. 2004).  Sentencing any of

Mr. Tejeda's co-conspirators, including those who have "cooperated" with the government, to

lower sentences than Mr. Tejeda would constitute the very sort of unwarranted sentence disparity

that Congress and the courts have worked so hard to avoid.  U.S.S.G. § 1A1.1, Commentary ¶ 3;

*Booker v. United States*, 543 U.S. 220, 250 (2005).

## CONCLUSION

Section 3553(a) expressly states that "[t]he court *shall* impose a sentence sufficient, but

not greater than necessary, to comply with the purposes [of sentencing]."  (Emphasis added.)

Here, a sentence of ten years for William Tejeda is more than sufficient to fulfill each of the

purposes of sentencing – punishment, promotion of respect for law, deterrence, protection of the

public, and rehabilitation.  Any greater sentence would be unnecessarily punitive.  Mr. Tejeda

has been convicted of a terrible crime, but he is not a bad person.  He is not beyond

rehabilitation.  He has no prior criminal record.  He is a family man, a hard worker, and a

wonderful father.  He is a perfect candidate never to recidivate.  He needs no more than a ten

---

[5]   The evidence at trial was that at the time of his arrest Mr. Tejeda lived modestly in a poor section of New
York, and had a full-time job working the night shift as a maintenance man in a Manhattan office building.
[PSR ¶¶ 122, 137.] There was no evidence that he ever personally kept any of the drug money that, according
to several witnesses, he received.

14

year sentence, and the public does not need him to have more than a ten year sentence. Mr.
Tejeda has never previously needed a second chance. He needs one now and there is every
reason to give him one. This was Mr. Tejeda's first offense. It will be his last.

WILLIAM TEJEDA,

By his attorneys,

David J. Apfel (BBO # 351139)
Jennifer L. Chunias (BBO # 644980)
Jennifer Fischesser (BBO # 651480)
William J. Trach (BBO # 661401)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617-570-1000

Dated: March 29, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document, and all attachments, has been filed through the ECF
system and will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF). In addition, paper copies will be sent via first class mail on March 29,
2006 to those indicated as non-registered participants. Simultaneously, a true and accurate copy
of the document, with attachments, will also be served upon U.S. Probation Officer Sean
Buckley by e-mail and first class mail.

LIBA/1683319.4

15

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 04-10098-WGY |
| MANUEL MENDES, | ) |
| CHRISTOPHER CUSTER, | ) |
| CARMEN FIGUEROA, | ) |
| DESIREE ALVES, | ) |
| WILLIAM TEJEDA, and | ) |
| JENNIFER PAVAO, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## NOTICE OF MANUAL FILING WITH CLERK'S OFFICE

Notice is hereby given that the documents, exhibits or attachments listed below have been

manually filed with the Court:

    1.    Tab A of the Sentencing Memorandum of Defendant William Tejeda.

The original documents are maintained in the case file in the Clerk's Office.

Respectfully submitted,

WILLIAM TEJEDA,

By his attorneys,

/s/ David J. Apfel
David J. Apfel (BBO # 551139)
Jennifer L. Chunias (BBO # 644980)
Jennifer Fischesser (BBO # 651480)
William J. Trach (BBO # 661401)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617-570-1000

Dated: March 29, 2006

LIBA/1687257.1

# EXHIBIT B

Representative Post-Booker "Crack" Cases In Which Defendants Received Below-Guidelines Sentences, Without Government Support (i.e., Without section 5K1.1 Motions)

| Case Name | Crime of Conviction | Criminal History Category | Guideline Range | Sentence |
|---|---|---|---|---|
| *Simon v. US* 361 F. Supp. 2d 35 (E.D.N.Y 2005) | Conspiracy to distribute 660 g of crack; use of a firearm in connection with a drug trafficking offense | III | 324-405 | 262 months |
| *US v. Avilez* 2005 WL 1660621 (E.D.N.Y. July 12, 2005) | Conspiracy to possess with intent to distribute greater that 50 g cocaine base | I | 46-57 | Probation; one year of community confinement |
| *US v. Beamon* 373 F. Supp. 2d 878 (E.D. Wisc. 2005) | Distribution of between 50 and 150 g crack; felon in possession of a firearm | III | 63-78 | 51 months |
| *US v. Carjaval* 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005) | Conspiracy to distribute crack | VI Career Offender | 262-327 | 168 months |
| *US v. Castillo* 2005 WL 1214280 (S.D.N.Y. May 20, 2005) | Conspiracy to distribute narcotics; possession with intent to distribute greater than 1.5 kg crack and 5 kg cocaine | I | 135-168 | 87 months |
| *US v. Clay* 2005 WL 1076243 (E.D.Tenn. May 6, 2005) | Conspiracy to distribute 496 g of crack | V | 235-293 | 156 months |
| *US v. Cook* 2005 WL 3447866 (E.D. Mich. Dec. 15, 2005) | Possession with intent to distribute 18.5 g crack cocaine; felon in possession of a firearm | III | 121-151 | 120 months |
| *US v. Davis* 2006 WL 389863 (E.D.Tenn. Feb. 17, 2006) | Conspiracy to distribute greater than 50 g of cocaine base and 5 kg of cocaine | II | 324-405 | 240 months (mandatory minimum) |
| *US v. Fisher* 2005 WL 2542916 (S.D.N.Y. Oct. 11, 2005) | Conspiracy to distribute greater than 1.5 kg crack; use of a firearm in connection with a drug trafficking offense | I | 235-293 (plus mandatory 60 months for firearm offense | 151 months (plus mandatory 60 months for firearm offense) |

Representative Post-Booker "Crack" Cases In Which Defendants Received Below-Guidelines Sentences, Without Government Support (i.e., Without section 5K1.1 Motions)

| Case Name | Crime of Conviction | Criminal History Category | Guideline Range | Sentence |
|---|---|---|---|---|
| US v. Hamilton Case No. 6:05-cr-157-Orl-31JGG (M.D. Fla. March 16, 2006) | Possession with intent to distribute greater than 50 g of cocaine base | I | 70-87 | 36 months |
| US v. Harris Crim. No. 04-0157 (JR) (D.D.C. Mar. 3, 2005) | Possession with intent to distribute greater than 5 g of crack | VI Career offender | 120-150 | 98 months |
| US v. Hubbard 369 F.Supp.2d 146 (D. Mass. 2005) | Possession with intent to distribute greater than 50 g of cocaine base | VI Career Offender | 188-235 | 108 months |
| US v. Leroy 373 F. Supp. 2d 887 (E.D. Wisc. 2005) | Distribution of 14.88 g crack and 31 g cocaine | VI | 100-125 | 70 months |
| US v. Murray 2005 WL 1200185 (S.D.N.Y. May 20, 2005) | Conspiracy to distribute more than 50 g of crack | I | 235-293 | 120 months |
| US v. Nellum 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) | Distribution of greater than 204 g of cocaine base; enhancement for possession of a dangerous weapon | III | 168-210 | 108 months |
| US v. Perry No. 04-089S (D.R.I. Sept. 20, 2005) | Possession with intent to distribute cocaine base within 1000 feet of a school | III | 188-235 | 120 months |
| US v. Person 377 F.Supp.2d 308 (D. Mass. 2005) | Possession with intent to distribute cocaine base | VI Career Offender | 262-327 | 84 months |
| US v. Roundtree Crim. No. 04-0157 (JR) (D.D.C. Mar. 3, 2005) | Possession with intent to distribute greater than 5 g of crack | II | 70-87 | 60 months |

Representative Post-Booker "Crack" Cases In Which Defendants Received Below-Guidelines Sentences, Without Government Support (i.e., Without section 5K1.1 Motions)

| Case Name | Crime of Conviction | Criminal History Category | Guideline Range | Sentence |
|-----------|--------------------|--------------------------|-----------------|----------|
| US v. Smith 359 F. Supp. 2d 771 (E.D. Wisc. 2005) | Possession with intent to distribute 69.99 g crack and 653.19 g cocaine; adjustment for possession of dangerous weapon in connection with a drug trafficking offense | II | 121-151 | 18 months |
| US v. Stukes 2005 WL 2560244 (S.D.N.Y. Oct. 12, 2005) | Distribution of 2.7 g crack cocaine; felon in possession of a firearm | III | 46-57 months (plus mandatory 60 months for firearm offense) | 33 months (plus mandatory 60 months for firearm offense) |
| US v. Thomas 360 F.Supp.2d 238 (D. Mass. 2005) | Possession with intent to distribute greater than 5 g of cocaine base | VI Career Offender | 360-life | 262 months |
| US v. Williams 372 F.Supp.2d 1335 (M.D. Fla. 2005) | Distribution of 34.8 g of crack | VI Career offender | 360-life | 204 months |
| US v. Williams 435 F.3d 1350 (11th Cir. 2006) | Possession with intent to distribute greater than 5 g of crack | VI Career offender | 188-235 | 90 months |

# EXHIBIT C

### United States District Court
### Middle District of Florida
### Orlando Division

UNITED STATES OF AMERICA

-vs-                                        Case No.  6:05-cr-157-Orl-31JGG

JERMAINE HAMILTON

_____

## MEMORANDUM SENTENCING OPINION

The Court held a sentencing hearing in this case on March 9, 2006, at which the Defendant, Jermaine Hamilton ("Hamilton"), and the Government presented evidence and argument. At the hearing, after briefly explaining its reasons, the Court imposed a sentence of thirty-six months, which is below the range established by the Federal Sentencing Guidelines. This Order further explains the Court's reasoning for imposing that sentence.

**I.      Background**

In August of 2005, a cooperating source ("CS"), at the behest of the Government, negotiated the purchase of some crack cocaine from Hamilton. Hamilton claims that he was a mere go-between or "mule" for the CS's usual supplier. Hamilton obtained a bag containing the crack from the supplier and delivered it to the CS in exchange for $1,800.[1] Hamilton gave the money to the supplier and received $300 from him for his efforts. The bag delivered by Hamilton to the CS contained 50.9 grams of crack cocaine. One month later, Hamilton was arrested and charged with possession with intent to distribute more than fifty grams of cocaine base in violation of 21 U.S.C. sections 841(a)(1) and 841(b)(1)(A)(iii).

_____

[1] Hamilton claims he did not know how much cocaine was in the bag.

## II.    Analysis

Prior to the hearing on this matter, Hamilton filed a motion for a downward departure or an adjustment to the sentencing guidelines,[2] arguing that a number of factors weighed in favor of a lenient sentence, including: (1) the nature and characteristics of this particular offense; (2) his personal history and characteristics; (3) his admission of guilt and expression of remorse; (4) his assertion that he is not a danger to the public and not a threat as a repeat offender; and (5) the allegedly unreasonable disparity between sentences for powder and crack cocaine. The Government opposed Hamilton's motion and reiterated its position that any sentence below the range established by the Guidelines is objectionable as unreasonable.[3]

### A. *Booker* and the Federal Sentencing Guidelines[4]

As a result of the Supreme Court's opinion in *U.S. v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines became an advisory, rather than mandatory, system of sentencing. *U.S. v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005); *U.S. v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). Although a "district court need not impose the sentence suggested by the Guidelines," *U.S. v. Gibson*,

---

[2] Construed as a motion for downward departure, this motion was denied. However, the Court considered these arguments in the context of imposing an appropriate sentence.

[3] This is not the first time the Court has commented on the Government's stubborn adherence to this position. For the Government to argue that any sentence below the Guideline range is per se unreasonable, it must also be true that a Guideline sentence is per se reasonable, which argument the Eleventh Circuit has explicitly rejected. *U.S. v. Talley*, 431 F.3d 784, 787 (11th Cir. 2005) ("We reject the argument of the United States that a sentence within the Guidelines range is per se reasonable").

[4] The Sentencing Guidelines were promulgated in order to reduce disparity and bring more uniformity to the sentencing process. Some have questioned whether they have achieved this objective. *See, e.g.*, AMERICAN COLLEGE OF TRIAL LAWYERS, UNITED STATES SENTENCING GUIDELINES 2004: AN EXPERIMENT THAT HAS FAILED (2004); Albert W. Alschuler, *Disparity: The Normative and Empirical Failure of the Federal Guidelines*, 58 Stan. L. Rev. 85 (2005).

-2-

434 F.3d 1234, 1253 (11th Cir. 2006), it still must consult and take them into account when fashioning sentences. *Crawford*, 407 F.3d at 1178; *see also U.S. v. Scott*, 426 F.3d 1324, 1330 (11th Cir. 2005) (describing the consultation of the Guidelines as "inescapable").

      Sentencing now requires two steps: first, the district court must consult the Guidelines and correctly calculate the range provided therein; second, the court must consider the factors listed in 18 U.S.C. section 3553(a) ("Section 3553(a)") and, after doing so, may impose a sentence that is either more lenient or more severe than provided for by the Guidelines, as long as that sentence is reasonable. *Talley*, 431 F.3d at 786; *Scott*, 426 F.3d at 1328-29 ("Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.") (internal citation and quotation omitted); *Crawford*, 407 F.3d at 1179. Clearly, then, district courts now have discretion in fashioning an appropriate sentence under the facts and circumstances of each case. *See U.S. v. Jimenez-Beltre*, --- F.3d ----, 2006 WL 562154 at *3 (1st Cir. Mar. 9, 2006) (district courts have discretion, post-*Booker*, to impose non-Guidelines sentences).[5]

The factors the district court is to consider include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing

---

[5] Because neither the Guidelines nor the policies on which they are based are mandatory, a district judge may therefore disagree with those policies and instead "apply his own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the Guidelines." *Booker*, 543 U.S. at 305 and n.3 (*Scalia, J., dissenting*); *see also id.* at 300-301 (*Stephens, J., dissenting*) (noting that *Booker* decision instituted a discretionary sentencing regime).

Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

*Talley*, 431 F.3d at 786; *see also* 18 U.S.C. § 3553(a). In fashioning a sentence, a district court need not engage in a detailed step-by-step analysis of the Section 3553(a) factors, nor must it even discuss each of those factors. *U.S. v. Lockhart*, 2006 WL 318765 at *2 (11th Cir. Feb. 13, 2006); *Williams*, 435 F.3d at 1353-54; *Scott*, 426 F.3d at 1329. Instead, it is sufficient for a court to acknowledge that it has considered the relevant arguments and the factors set forth in Section 3553(a). *Scott*, 426 F.3d at 1330; *Talley*, 431 F.3d at 786. In deviating from the Guidelines, however, a district court must set out its reasons for doing so. *Gibson*, 434 F.3d at 1254 n.37; 18 U.S.C. § 3553(c).

B. Hamilton's Advisory Guidelines Sentence[6]

In this case, the Guidelines advise the imposition of a sentence of between seventy and eighty-seven months.[7] This calculation is made as follows: (1) the base offense level for possession of more than fifty grams of crack cocaine is 32; (2) Hamilton qualified for the "safety valve" exception to the statutory mandatory minimum and for a two-level reduction (under Guideline §§ 5C1.2 and 2D1.1(b)(7)), bringing him to an offense level of 30; (3) Hamilton qualified for a three-level reduction for acceptance of responsibility, thus arriving at a final offense level of 27; and (4) Hamilton has a criminal history category of I. Thus, Hamilton faces a Guideline sentence of roughly between six and seven years.

---

[6] Under 21 U.S.C. § 841(b)(1)(A)(iii), the mandatory minimum sentence applicable to the offense with which Hamilton was charged is ten years, with a maximum of life in prison. However, Hamilton qualified for the safety valve, i.e., a sentence imposed without regard to the statutory mandatory minimum. *See* 18 U.S.C. § 3553(f); *see also* USSG §§ 5C1.2, 2D1.1(b)(7).

[7] The Court addresses this factor first, pursuant to the law of this Circuit. In addition, Section 3553(a)(4) directs the Court to consider the sentence advised by the Guidelines.

-4-

## C. Applying the Section 3553(a) Factors

### 1) Section 3553(a)(1)

Section 3553(a)(1) directs the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In this case, Hamilton acted as a runner in a single drug transaction involving 50.9 grams of crack cocaine.[8] Although he was aware that he was engaged in a drug transaction, he was unaware of the amount of drugs involved. Hamilton has only one prior criminal offense.[9] There is no indication of any violence in his past, nor that he has a tendency toward violence.

Hamilton (28 years old) is a frail individual, standing 5'3" tall and weighing only 103 pounds. He has a congenital heart defect which has required multiple heart surgeries since age 8, and he still suffers chest pains as a result. (Pre-Sentence Report, ¶ 31). He lives with his paramour, with whom he has three children, and both he and his paramour are gainfully employed and work to support their family. A lengthy sentence for a single, atypical, relatively minor offense would severely disrupt what

---

[8] It is notable that it was the Government that selected the amount of cocaine for this transaction. It was probably no coincidence that the amount of crack involved exceeded (just barely) the fifty gram threshold for the harsher sentences imposed under 21 U.S.C. § 841(b)(1)(A). Many commentators have recognized that the Sentencing Guidelines did not restrict judicial discretion so much as transfer it to federal prosecutors, agents, and investigators, who retain near-complete discretion regarding, for example, the quantities of contraband to be purchased in a sting or the charges to be brought against a particular defendant. *See, e.g.*, Gerald W. Heaney, *The Reality of Guidelines Sentencing: No End to Disparity*, 28 Am. Crim. L. Rev. 161 (1991); *and* Jeffrey L. Fisher, Comment, *When Discretion Leads to Distortion: Recognizing Pre-Arrest Sentence Manipulation Claims Under the Federal Sentencing Guidelines*, 94 Mich. L. Rev. 2385 (1996); *and* Albert W. Alschuler, *Disparity: The Normative and Empirical Failure of the Federal Guidelines*, 58 Stan. L. Rev. 85 (2005).

[9] Over ten years ago, Hamilton pled *nolo contendere* to a drug possession charge and received a sentence of probation.

-5-

is, by all appearances, a solid and productive family situation.[10] In the Court's judgment, these factors weigh heavily in favor of leniency.

*2) Section 3553(a)(2)(A)*

Under Section 3553(a)(2)(A), the Court considers the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). These concepts lend themselves to subjective interpretation. There are two basic considerations at issue here: first, the disparity in sentences between crack and powder cocaine; and, second, an application of the Section 3553(a)(2)(A) factors to the circumstances of this case.

The chemical compound $C_{17}H_{21}NO_4$ occurs naturally in the coca leaf. This compound is usually processed for importation into the United States by dissolving the cocaine base in hydrochloric acid and water to create a salt: cocaine hydrochloride, $C_{17}H_{22}ClNO_4$ (powder cocaine). Powder cocaine may then be converted back to its base form by cooking it with baking soda and water. *See U.S. v. Sloan*, 97 F.3d 1378, 1381-82 (11th Cir. 1996). In numerous trials before this Court, the Government's forensic chemists have testified that powder and crack cocaine are the same chemical substance, just in a different form.

Yet, there is a radical disparity in the fashioning of sentences imposed upon those defendants found guilty of crack cocaine offenses and those imposed upon defendants guilty of powder cocaine offenses. For example, there is the "100 to1" powder to crack ratio, pursuant to which a defendant who has a certain quantity of crack will receive the same mandatory minimum sentence as a defendant

---

[10] Numerous members of Hamilton's extended family appeared in support of him at the sentencing hearing.

-6-

who has one hundred times that amount of powder cocaine. *See* 21 U.S.C. §§ 841(b)(1)(A), (b)(1)(B) (mandatory minimum sentences of ten and five years, respectively, imposed upon defendants for five kilograms of powder or fifty grams of crack cocaine (under (b)(1)(A)), and five hundred grams of powder or five grams of crack cocaine (under (b)(1)(B)). The Guidelines have incorporated this ratio, so that five kilograms of powder cocaine and fifty grams of crack cocaine are both scored at the same level.

This disparity has been widely criticized, and the United States Sentencing Commission itself has repeatedly suggested that a 20:1 ratio would be more appropriate.[11] United States Sentencing Commission, "Fifteen Years of Guidelines Sentencing," 131-32 (Nov. 2004), *available at* http://www.ussc.gov/15_year/15year.htm. The Sentencing Commission has also reported that many of the rationales originally relied upon to produce the disparity between powder and crack cocaine are unsupportable,[12] because: (1) the harms associated with crack do not justify a substantially harsher treatment; (2) the increased addictiveness of crack results not from a pharmacological difference

---

[11] The Sentencing Commission at one time suggested applying a 1:1 ratio, a suggestion that Congress rejected. *See U.S. v. Sloan*, 97 F.3d 1378, 1383 (11th Cir. 1996). There is no indication that Congress has considered the Commission's 20:1 suggestion, and a number of courts have applied this ratio in fashioning sentences post-*Booker*. *See U.S. v. Perry*, 389 F. Supp. 2d 278, 307-308 (D.R.I. 2005); *U.S. v. Smith*, 359 F. Supp. 2d 771, 781-82 (E.D. Wis. 2005.); *U.S. v. Castillo*, 2005 WL 1214280 at *5 (S.D.N.Y. May 20, 2005); *U.S. v. Clay*, 2005 WL 1076243 at *6 (E.D. Tenn. May 6, 2005) (applying variance from 100:1 ratio). Applying a 20:1 ratio in this case, the advisory sentence for one kilogram of powder cocaine (all other factors being equal), would fall within a range of thirty-seven and forty-six months, or almost half of the advisory sentence for Hamilton's crack cocaine-related offense.

[12] Congress amended the federal drug laws in response to growing concern over the use and abuse of crack cocaine, and relied upon a variety of rationales for doing so. *Sloan*, 97 F.3d at 1382. Those rationales include: (1) crack is more powerful and more dangerous; (2) crack has a more rapid onset of action and is more addictive; (3) crack can be sold in smaller quantities; and (4) crack is more easily available and less expensive. *U.S. v. Terry*, 60 F.3d 1541, 1545 (11th Cir. 1995); *U.S. v. Harden*, 37 F.3d 595, 602 (11th Cir. 1994); *U.S. v. Byse*, 28 F.3d 1165, 1169 (11th Cir. 1994).

-7-

between it and powder cocaine, but from the differing manners in which the two drugs are normally used;[13] (3) the harms associated with crack are not as severe as initially feared and no more serious than those harms resulting from exposure to powder cocaine; (4) larger percentages of the defendants subject to the increased penalties do not fit the mold of serious or high-level traffickers that Congress intended to target when initially establishing those penalties, and instead, most crack cocaine offenders receiving these harsh penalties are low-level offenders; (5) crack cocaine is the only drug for which such harsh penalties are imposed on low-level offenders; and (6) high penalties for relatively small amounts of crack cocaine divert federal resources away from high-level traffickers toward low-level dealers.[14] *Id.* at 132. Finally, the crack/powder disparity results in a disparate impact along racial lines, with black offenders suffering significantly harsher penalties.[15] *Id.*

This arbitrary and discriminatory disparity between powder and crack cocaine implicates the Section 3553(a)(2)(A) factors. Unless one assumes the penalties for powder cocaine are vastly too low, then the far-higher penalties for crack are at odds with the seriousness of the offense. The absence of a logical rationale for such a disparity and its disproportionate impact on one historically

---

[13] Powder cocaine that is smoked is equally as addictive as crack, and injected powder cocaine is more addictive and more harmful than crack. United States Sentencing Commission, "Fifteen Years of Guidelines Sentencing," 131-32 (Nov. 2004), *available at* http://www.ussc.gov/15_year/15year.htm.

[14] Congress' effort to reduce the trafficking of crack cocaine by imposing draconian penalties has clearly not worked. In theory, the increased penalties and imprisonment imposed on crack dealers should limit the supply and increase the cost of crack cocaine relative to powder cocaine. But, as the Government concedes, crack remains relatively inexpensive, even though it is derived from powder.

[15] Generally, powder cocaine is the drug of choice for white Americans, while crack is favored by black Americans. Hamilton is black.

-8-

disfavored race promotes disrespect for the law and suggests that the resulting sentences are unjust.[16]
Accordingly, these statutory factors weigh heavily against the imposition of a Guidelines sentence.

Moreover, given the isolated nature of this event and the lack of evidence suggesting that
Hamilton is engaged in the drug trade beyond this case,[17] the amount of cocaine involved, and the
amount of money he received, Hamilton stands on the lowest tier of the cocaine offender hierarchy.
The Court simply cannot in good conscience find that sentencing Hamilton in strict accordance with
the Guidelines under these circumstances would either reflect the seriousness of his offense or justly
punish him for it.[18] A Guideline sentence would, instead, contribute to the disrespect in which many
observers hold the federal drug and sentencing laws. These factors convince the Court that a more
lenient sentence than the one advised by the Guidelines is warranted.

*3) Sections 3553(a)(2)(B)-(D)*

The remaining pertinent factors include the need for the sentence to adequately deter criminal
conduct, to protect the public from further crimes committed by the defendant, and to provide the
defendant with the necessary training, care and treatment.[19] *See* 18 U.S.C. §§ 3553(a)(2)(B), (C), (D).

---

[16] It is notable that, under the Guidelines, if crack were treated as the same chemical substance
as powder cocaine (which it is), a 1:1 ratio would result in a sentencing range of only eight to fourteen
months.

[17] There was a suggestion at the sentencing hearing that Hamilton was involved in other
cocaine transactions, but there is no mention of such activity in the pre-sentence report; thus the Court
places no weight on that suggestion.

[18] At the hearing on this matter, the Government stated that if the Court were to impose a
sentence of only a few days below the Guidelines range, the Government would object (and,
presumably, would list this case in its secret file on judges who impose sentences below the Guideline
range, *see U.S. v. Williams*, 372 F. Supp. 2d 1338 n.7 (M.D. Fla. 2005)).

[19] Several of the Section 3553(a) factors are not pertinent to this case, such as avoiding
unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)), and the need to provide restitution to

Clearly Congress has determined that deterrence for this type of offense is to be accomplished through the incarceration of offenders. *See* 21 U.S.C. § 841(b). The issue, therefore, is what amount of deterrence is necessary *in this case*. Hamilton testified, credibly so in the Court's opinion, that he was profoundly sorry for his actions, he has learned his lesson, and would not make the same mistake again. Thus, while a substantial term of incarceration is warranted as a deterrent to Hamilton and others, three years is ample under the circumstances. Further, although the Court doubts that the public requires much, if any, protection from Hamilton, incarceration will serve the purpose of removing Hamilton from the streets so that he will be unable to commit any similar offense (assuming he were so inclined) while incarcerated. Finally, while incarcerated, Hamilton will be able to avail himself of the various educational and vocational programs offered by the Bureau of Prisons. Thus, while incarceration is clearly justified, the Court finds that these goals are met by an incarceration of a lesser duration than that suggested by the Guidelines.

## III. Conclusion

Congress, of course, has the responsibility to proscribe criminal conduct and establish the sentencing range for those who commit crimes against the United States. Congress has also enumerated the factors which the Court must take into account when imposing sentence. But the imposition of an appropriate sentence is a judicial function. It is the Court that is called upon to make the hard decisions necessary to integrate Congressional mandates with the requirements of justice,[20]

---

victims (18 U.S.C. § 3553(a)(7)), and thus the Court does not consider them here. Further, inasmuch as the only type of sentence available in this case is incarceration, the Court does not address 18 U.S.C. section 3553(a)(3) ("the kinds of sentences available").

[20] As stated in The Federalist Number 51: "Justice is the end of government. It is the end of civil society. It ever has been and ever will be pursued until it be obtained, or until liberty be lost in the pursuit." THE FEDERALIST NO. 51 (James Madison).

based on the facts and circumstances of each case that comes before it. This requires the Court to exercise its discretion in consideration of all the statutory factors, not just the Guidelines.

But, notwithstanding *Booker* and recent Eleventh Circuit authority, the Government seeks to limit the Court's discretion to a consideration of the Guidelines only, ignoring the other sentencing factors. In so doing, the Executive Branch oversteps the bounds of its Constitutional authority, by attempting to usurp the Court's traditional role in the sentencing process.

Attacks such as this on the independence of the judiciary are not new. In his seminal work, "Democracy in America," Alexis DeTocqueville noted a tendency to diminish judicial authority in the United States. He predicted that such attacks, if successful, would be attended with "fatal consequences," and predicted that "it will be found out at some future period that by thus lessening the independence of the judiciary they have attacked not only the judicial power, but the democratic republic itself." Alexis DeTocqueville, DEMOCRACY IN AMERICA, Vol. I, Ch. XVI at 279 (Knopf ed. 1945; Everyman's Library, 1994, Ninth Printing).

Tension between the branches of our government is a natural consequence of human nature and was seen by our founding fathers as the foundation for the checks and balances built into our system of government. As Madison said in Federalist Number 51, the security against a gradual concentration of the several powers in the same department, "consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others." THE FEDERALIST NO. 51 (James Madison). Courts must therefore be allowed to exercise appropriate discretion in fashioning a just sentence. Absent such discretion, the Court becomes nothing more than an arm of the other two branches of government.

Because more than 95 percent of all criminal prosecutions result in a guilty plea, sentencing is the most significant role played by the judiciary in the administration of our criminal justice system. Reducing the Court's role in sentencing to that of merely rubber-stamping the will of Congress as interpreted by the Executive Branch would sabotage one of the essential checks and balances envisioned by our founders. In short, the pursuit of justice requires the meaningful participation of judges, lest DeTocqueville's warning come true.

There are certainly cases where a sentence within, or even above, the Guidelines would be appropriate. This is not one of those cases. Considering all of the relevant factors, including the sentence advised by the Guidelines, the nature of this offense, the circumstances of this case, and the characteristics of the Defendant, a sentence of thirty-six months is sufficient, but not greater than necessary, to satisfy the requirements of 18 U.S.C. § 3553.

**DATED** in Chambers in Orlando, Florida on March 16, 2006.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Jermaine Hamilton

-12-